Whitakee, Senior Judge,
delivered the opinion of the court;
Plaintiff is now receiving retired pay of 75 percent of his active duty pay because he was permanently and totally disabled while serving on active duty in the Navy. This is the maximum retired pay to which any member of the Armed Forces is entitled, whatever may have been the cause of his disability or the extent of it. It is the maximum retired pay to which any naval officer is entitled, for whatever reason he may have been retired. All formulas for the computation of retired pay are subject to the limitation that it shall not exceed 75 percent of their active duty pay. Plaintiff was permanently and totally disabled and by reason thereof he is receiving the maximum of 75 percent of his active duty pay.
Notwithstanding this, he secured the introduction in the Senate of a Bill directing the payment to him of an additional $100,000 on the ground that his disability was the result of malpractice by Government doctors in performing an operation on him for hernia and in their post-operation treatment of him.
*395 Since plaintiff cannot bring a suit for the alleged malpractice under the Federal Tort Claims Act, 28 TJ.S.C. §§2671, et seq. (1958), because (1) the subject injury was sustained incident to military service while on active duty [Feres v. United States, 340 U.S. 135 (1950); Buer v. United States, 241 F. 2d 3 (7th Cir. 1956)] and (2) the cause of action arose in a foreign country [United States v. Spelar, 338 U.S. 217 (1949)], or under any other act of Congress, special legislation was necessary for plaintiff to obtain the relief he seeks. A Bill directing the payment to plaintiff of $100,000 was introduced in the Senate (S. 327, 87th Cong., 1st Sess. (1961)). It was referred to this court with, the request that we report on “the nature and. character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimant.”
As stated above, plaintiff has no legal claim against defendant. Nor do we think he has any claim in equity and good conscience. The only two things done by the doctors which, could possibly have been construed to be malpractice were performing the hernia operation when plaintiff’s blood pressure was low and the misdiagnosis of the cause of his post-operative condition. We do not understand that it is, any longer seriously contended that it was malpractice to operate on plaintiff in the then state of his blood pressure, or if there is still such a contention, it is wholly without merit. But even if either of these two things could have caused in any degree the distressful consequences of the operation performed on him, there is no moral obligation on defendant to pay plaintiff any greater compensation for his disability than thousands of others, retired for equally severe and irreparable disabilities, are receiving. Plaintiff’s disability may have been caused in part by a misdiagnosis; others have been caused by wounds on the field of battle, or by mistreatment or even atrocities inflicted on prisoners of war, or by some malignant disease contracted in the jungles or elsewhere. Whatever the cause, permanent and total disability, whatever, may be the nature of it or the cause of it, entitles an officer to retirement at 75 percent of his active duty pay, and no more.
*396 Let it- also be borne in mind that tlie various acts of 'Congress relating to benefits for veterans are a declaration by Congress of wbat it considers its moral duty to those who have served in the Armed Forces and have become sick or disabled as a result of it. The retired pay which plaintiff is receiving and any benefits to which he may be entitled under the various acts relating to compensation to veterans are the extent of the obligation which the Congress has thought it owed to persons disabled on account of their service in the Armed Forces. But plaintiff is asking something to which no other veteran is entitled. He is asking not only for the maximum retired pay to which any veteran is entitled and whatever he may be entitled to under the Veterans’ Compensation Acts, but'$100,000 in addition to all this. No other veteran is entitled to what plaintiff is asking.
Moreover, our trial commissioner, who has made a thorough and exhaustive report, finds that the doctors who ministered unto plaintiff were not guilty of any malpractice. There was no naval hospital in the London area and, by arrangement between the Navy and the Air Force, the hernia operation was performed at an Air Force hospital at Euislip, England, which is a suburb of London. Plaintiff takes no exception to the finding that the Government doctors were guilty of no malpractice, and the trial commissioner’s report and the evidence very clearly demonstrates that it is correct. Plaintiff’s injury was not the result of malpractice but the result of an accident which could not have been prevented with the facilities available at the hospital where the hernia operation was performed.
The commissioner’s findings show that plaintiff’s symptoms could have equally been attributable to a psychiatric brain disorder as well as to an organic brain disorder. When the' surgeon who operated on plaintiff abandoned his first diagnosis, that plaintiff’s trouble was attributable to the spinal anaesthetic, and then concluded that his trouble was of a psychiatric nature, he called in a psychiatrist. This psychiatrist confirmed the surgeon’s impression that plaintiff’s trouble was of a psychiatric nature and treated him accordingly. There was nothing wrong in this since, as we stated *397 above, plaintiff’s symptoms could have been attributable to a psychiatric disorder as well as to an organic disorder.
The commissioner’s findings show that in all likelihood no one other than a properly trained and experienced neurologist could have determined whether plaintiff’s disorder was of the one character or the other. We agree that no doctor, except one trained in neurology, could be expected to have determined, at least in the early stages, that plaintiff was suffering from an organic brain disorder. But no neurologist was available at the hospital where the operation was performed. The trial commissioner finds “The need for neurologists in small hospitals of this type [the type in which the hernia operation was performed] is so rare that few have them as permanent staff doctors. Only 8 of the 26 naval hospitals throughout the United States have neurologists and only one of all the naval hospitals abroad has such a specialist.” ; [Finding 41 (a)']
Plaintiff did not respond to treatment. When his wife became increasingly alarmed at this, she consulted a Dr. Kose, a Navy doctor in London. He went to see plaintiff and, after examining him, he came to the conclusion that plaintiff had suffered an organic cerebral accident. After consultation with Dr. Brown (the surgeon who had performed the operation) and after being assured by Dr. Brown that everything was being done for plaintiff that could be done, he left without having given expression to anyone that in his opinion plaintiff had suffered an organic cerebral accident.
Plaintiff’s wife also consulted a friend of hers in whose family there was a psychiatrist. This psychiatrist suggested that a neurologist should examine plaintiff. Thereupon, at the request of plaintiff’s wife, Dr. Rose arranged for plaintiff to be examined by one of the two most outstanding neurologists in the city of London. The Air Force very promptly consented to plaintiff’s transfer to this private hospital and agreed to pay and did pay all of plaintiff’s expenses there and also paid the bill of the neurologist, Sir Russell Brain, now Lord Brain, for his examination and treatment of plaintiff. This gentleman was in private practice. He requested that plaintiff be transferred to his hospital. After an extended examination of plaintiff, Dr. Bralm *398 came to the conclusion that plaintiff had suffered a cerebral hemorrhage.
Thereafter, plaintiff was removed to the Naval Hospital at Bethesda, Maryland. There some of the doctors thought that plaintiff had suffered an embolism, others thought he liad suffered a thrombosis. The trial commissioner finally concludes that it was a thrombosis; but, whether a thrombosis, embolism, or a hemorrhage, there is no doubt that plaintiff had suffered an organic cerebral accident.
But the salient determinative fact is, with the facilities available at the Air Force hospital where the hernia operation was performed, no doctor on the staff could have been expected to make this determination or to have concluded that psychiatric treatment was improper, and that plaintiff’s condition called for the services of a neurologist. The trial commissioner’s findings and the evidence unquestionably show that the staff at this hospital was guilty of no negligence, malpractice, or malfeasance, and gave to plaintiff every treatment indicated to men thoroughly competent in their respective spheres of the medical profession.
For a more detailed recitation of the facts concerning plaintiff’s treatment and his failure to respond thereto, the Senate is respectfully referred to the trial commissioner’s report, which we have adopted in full with the exception of the last three sentences in his Finding 41(c), in which he concludes: “Although the record does not support a finding of malpractice in the technical legal sense, it does present a strong claim to favorable consideration on a broad equitable or moral basis.” We do not adopt this conclusion of the trial commissioner because we think that if plaintiff is given any compensation for his total and permanent disability in addition to the compensation to which all other persons who are totally and permanently disabled are entitled, he would be given preferential treatment, which is abhorrent to our sense of justice. If Congress chooses to pass a Bill applicable to all members of the Armed Forces whose disability is of a particularly grievous nature, our objection to the present Bill would be removed. Whether such a Bill should be passed is for Congress alone to decide. But the present Bill gives to plaintiff a very large sum to which no other officer totally *399 and permanently disabled is entitled. See Stone v. United States, 160 Ct. Cl. 128, 132 (1963).
In onr opinion plaintiff lias neither a legal nor an equitable claim, and if anything is paid to plaintiff in addition to the maximum retirement pay which he is drawing, it would be a pure gratuity.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the U.S. Senate pursuant to S. 327, 87th Congress, 1st Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Bichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a citizen of the United States and á resident of Montgomery County, Maryland. He was born April 10, 1912. From the time of his graduation from the United States Naval Academy on June 6, 1935, and his then being commissioned as an ensign, plaintiff served honorably in the Navy until the fall of 1955, having been promoted through the several grades to the rank of captain.
2. In January 1955, plaintiff was assigned to duty in London, England, in the Navy’s Logistics Department. On January 18, 1956, plaintiff was given a routine physical examination. During the course thereof, it was discovered that he had a hernia. Although plaintiff had no symptoms thereof, an operation to correct the condition was advised, and plaintiff decided to have such an operation performed. He had never had any previous surgery.
3. The Navy had no hospital of its own in the London area. It merely had a dispensary. However, the Air Force did have a relatively small hospital, known as the 7520th Air Force Hospital, located in Buislip, which is around 18 miles outside of London. The hospital had 70 beds and a medical staff of from 15 to 18 Air Force physicians. It was one of about 12 buildings, all of which constituted the headquarters of the 7520th Third Air Force. By arrangement with the Air Force, the Navy was permitted the use of this hospital. As a result, arrangements were made for an operation upon plaintiff at such hospital.
*400 4. (a) During the morning of February 2, 1956, plaintiff was admitted to the Air Force Hospital. The chief of the hospital’s surgical service was Captain Webster E. Brown, Medical Corps, United States Air Force, a qualified and experienced surgeon, who was to perform the operation the following morning. Shortly after admission, Dr. Brown gave plaintiff the usual physical examination prior to surgery, including the taking of his blood pressure, which was 110/74.[1] Although such a reading is within the range of normality, it is considered sufficiently low to be classified as “low normal.” However, blood pressures are relative and must be viewed in light of the particular individual involved. For an individual ■of plaintiff’s age, build, weight, past medical history, and other characteristics, Dr. Brown was satisfied that the pressure was sufficiently normal for the planned operation.
(b) Dr. Brown also directed that the usual laboratory and X-ray studies be made, including blood tests. All these studies were reported as negative or within normal limits.
(c) Based upon all the data, including plaintiff’s past medical history and the results of the preoperative examination, there was no apparent reason why the operation should not have been performed. Plaintiff was in good health. The only significant finding was the presence of the hernia. Accordingly, Dr. Brown decided to proceed with the operation the following morning, as planned. (Plaintiff was to be the second patient to be operated on.) Fie thereupon issued various routine instructions concerned with preparing plaintiff for the operation, including the administration of the normal dose of nembutal (a sleeping tablet) at 7 a.m. the following morning (the morning of the operation), and, one hour later, the usual amounts of additional sedatives (atropine and morphine). These are routine preoperative medications administered so that the patient will be mildly sedated before entering the operating room, thus reducing his apprehensions.
*401 Prior to retiring that night plaintiff was also given a sleeping tablet upon the orders of Captain Rafael Beltran, also of the USAF Medical Corps. Dr. Beltran was also a qualified and experienced surgeon who had performed many hernia repairs and who was to be Dr. Brown’s first assistant at plaintiff’s operation.
All of the decisions, orders, and practices on February 2, 1956, conformed with accepted and normal medical procedures and principles.
5. (a) During the early morning of February 3, 1956, the preoperative medication was duly administered, as ordered, the nembutal being given at 7 a.m. and the atropine and morphine one hour later. At 9 a.m. plaintiff was taken to the operating room at which time his blood pressure was taken by an experienced and competent nurse-anesthetist. The blood pressure reading was 90/40. This represented a drop in plaintiff’s 110/74 blood pressure at the last previous time it had been taken the previous day (finding 4) of 20 points systolic and 34 points diastolic. Although this represented a substantial drop from a pressure that was already within the range of low-normal, Dr. Brown did not consider it to be of such magnitude as to warrant a postponement or cancellation of the operation. For an individual such as plaintiff, he concluded that as long as the systolic pressure was over 80, no real risk would be encountered in proceeding with the operation. ■ Some drop in plaintiff’s blood pressure was to be expected-. A drop of as much as 10 points systolic or even somewhat more is not uncommon as the ordinary result of a good night’s rest. (Plaintiff had had a sleeping pill before retiring the previous night (finding 4).) In addition, the early morning sedation he received also normally causes such a drop. Plaintiff’s preoperative medication had not worn off and he was not apprehensive.
However, since plaintiff was to be operated upon under a spinal anesthetic, and since the administration thereof normally causes a further drop in blood pressure, it is considered advisable, as normal routine, to administer a drug designed to raise the pressure before the anesthesia is injected and thus prevent a further blood pressure decline as the result of the effect of the spinal. Ephedrine sulphate, a blood vessel con *402 strictor, is commonly used for this purpose, and at 9:10 a.m., plaintiff was administered this drug by the nurse-anesthetist.
(b) At 9:20 a.m. plaintiff’s blood pressure was again taken to ascertain whether the ephedrine sulphate had had its designed effect. The reading was 100/50. With this rise, Dr. Brown concluded that there was no reason not to operate and •thereupon administered the spinal anesthetic. Although nurse-anesthetists normally administer general anesthetics and other routine drugs in the operating room, the surgeons themselves commonly administer spinal anesthetics.
(c) At 9:25 a.m. plaintiff’s blood pressure was again taken and the reading still showed 100/50, indicating that the ephedrine sulphate had successfully counteracted the pressure lowering effect of the spinal anesthesia. Thereupon an intravenous infusion of dextrose and water was started in an arm vein. This too is a normal precautionary measure designed to enable the instantaneous administration of drugs during the course of the operation should the need therefor arise. Should shock occur during the course of the operation, the intravenous running prevents the collapse of the veins and facilitates the 'rapid administration of drugs.
(d) At 9:30 a.m. plaintiff’s blood pressure was again taken and again the reading- was 100/50, indicating stabilization at such figures and confirming Dr. Brown’s decision to proceed with the operation. Thereupon, plaintiff was given (a mask having been placed over his face for this purpose) a small amount of a general anesthetic (sodium pentathol). At the same time oxygen was administered. Such an anesthetic is given in addition to the spinal in order to make the patient unaware of what is occurring in the operating room. This anesthetic was given to plaintiff only during the first part of the operation and for 10 minutes. Sometimes it takes- a little time for the spinal to take effect and the sodium pentathol insures the patient’s sleeping and not experiencing any sensation at the commencement of the operation and until the spinal takes full effect. The simultaneous administration of the oxygen, to make certain at this time that there is adequate oxygen in the blood, is also a routine precautionary measure.
At the same time (9:30 a.m.), the incisión, and the actual operation, commenced, with Dr. Beltran acting as Dr. Brown’s chief assistant.
*403 (e) Thereafter, the operation proceeded in normal fashion, without any unusual incidents or complications, and was completed at 10:05 a.m. Between 9:30 and 10:05 a.m., plaintiff’s blood pressure was taken every 5 minutes, the last being taken at 10:05 a.m. All the readings were 100/50, except the reading at 9:55 a.m. which was 110/50.
Thus, including the initial reading of 90/40 when plaintiff first came into the operating room at 9 a.m. and the last reading at 10:05, there had been 11 readings, i.e., one at 9 a.m., one at 9:20 a.m., and one every 5 minutes thereafter up to 10:05 a.m. All the readings were, although low, within the range of normality.
(f) At 9 a.m., when plaintiff arrived at the operating room, his pulse and respiration had also been taken, and during the operation, commencing at 9:30 a.m., the anesthetist also checked plaintiff's pulse and respiration at 5-minute intervals. The respiration was a constant 20 per minute. The pulse rate at 9 a.m. was approximately 88 and, during the 5-minute intervals, was between 80 and 85. These were normal for such an individual.
(g) Upon completion of the operation, Dr. Brown issued the Usual post-operative orders, including instructions that the intravenous be completed, that plaintiff remain flat in bed (i.e., without a pillow) for 20 hours, and that fluids and diet, as tolerated, and medications for pain, as required, be given. The purpose of having the patient remain flat in bed for 20 hours is to reduce the possibility of the development of a post-spinal headache, a not unusual occurrence after the administration of spinal anesthesia.
(h) There is no showing that any preoperative or operative procedure or technique, or any of the aforementioned orders issued or decisions and conclusions arrived at by Dr. Brown and his chief assistant Dr. Beltran, was not in accordance with accepted and sound medical principles and practices. . ;
6. (a) At 10:15 a.m. plaintiff was moved from the operating room to the recovery room, which is a ward where all patients operated upon are taken immediately after the operation. Patients in this ward are carefully watched by the nurses so that if complications arise, such as hemorrhages or shock, which, if they occur at all, normally occur in the *404 very early part of the post-operative period, the proper treatment can immediately be given. In this ward, all the necessary drugs and instruments are present. Upon arrival in this ward, plaintiff’s blood pressure, pulse and respiration were again checked. The blood pressure was 118/76, the pulse rate was 82, and the respiration was 20. All were normal. Plaintiff was in partial awareness and made no complaints. It takes approximately 3 hours for the intravenous which plaintiff was given at 9:26 a.m. to be completed and in plaintiff’s case it ended at 1:35 p.m. At that time plaintiff’s blood pressure was again checked by a nurse, who noted it as being “Good”.
Plaintiff’s operation was the last performed by Dr. Brown that day and Dr. Brown too checked plaintiff while he was in the recovery room.
No complications having arisen and plaintiff’s condition appearing to be normal, he was, at 1:35 p.m., upon the completion of the intravenous infusion, transferred to the surgical ward and told to remain flat in bed for 20 hours. It was reasonably considered that no further pressure readings were necessary at that time. That night, plaintiff was given a Sleeping pill and slept most of the night.
(b) There is no showing that any of the procedures and techniques employed by Dr. Brown or the hospital staff while plaintiff was in the recovery room or shortly thereafter in the surgery ward failed in any way to comply with accepted and sound medical principles and practices.
7. On the morning of the following day, February 4, 1956, plaintiff had a headache for which he received medication. Furthermore, he was unable to raise his head. This condition continued for most of the day. After the fulfillment of the doctor’s orders about remaining flat in bed for 20 hours, plaintiff was, after 3 p.m., also upon the doctor’s orders, urged by the nurses on the ward to get out of bed and to walk around as much as possible. Early ambulation after surgery, commencing the day after the surgery and increasing each day, is now a commonly employed technique and is in accordance with accepted medical practices. The purpose of such ambulation is to reduce the possibility of post-operative pulmonary embolism. Prior to the adoption of this routine as standard, post-operative practice, such embolisms were more common. *405 An embolism is a piece of matter, usually a blood clot (thrombus) which forms in one part of the body, breaks off, and is. carried by the blood stream, lodging in a blood vessel in another site. After an operation, regardless of the site thereof, an embolus, if it forms at all, will normally form in the leg veins. If, after an operation, too much time is spent in bed, the blood has a tendency to slow up, resulting in a piling up of the blood in the legs or pelvic region. If this continues too long, a clot can form within a vein. When it thus comes from the lower part of the body, i.e., the leg veins, the pelvic region, or even from the operative site, the embolus would normally be carried by the veins to the right ventricle of the heart, then to the right auricle, and then to the lungs where it is trapped by the small lung capillaries before being carried to the left side of the heart and through the aorta into the arterial system. Thus trapped, it causes a pulmonary embolism. Such an embolism is extremely dangerous and- can result in death. Embolism is a recognized complication of surgery and all that can be done is to post-operatively reduce its possibility by the recognized method of early ambulation.
As a result of the doctor’s orders and the nurses’ urgings, plaintiff did get out of bed once during the latter part of the afternoon or evening but became so dizzy and nauseous, with a tingling sensation in his body, that he returned to bed as quickly as possible. He was unable to eat.
Dr. Brown saw the patient that day on his usual rounds and was not concerned about plaintiff’s condition. Plaintiff’s symptoms were those frequently exhibited after operations conducted under spinals. When such patients first get out of bed they often feel weak, nauseous and dizzy. Such symptoms frequently last several days, and sometimes as long as a week or 10 days. They are commonly associated with and referred to as a post-spinal headache, caused by the spinal puncture. However, it is the physical exercise resulting from early ambulation that causes contraction of the muscles and stimulates the heart, thus resulting in better circulation, the more normal functioning of the cardiovascular system, and the great reduction in emboli.
8. On February 5, 1956, the second post-operative day, plaintiff still suffered from a headache. He also experienced *406 pain in the spinal region and a stiff neck. He resisted the nurses’ urgings that he get out of bed.
In the afternoon, plaintiff was given medication for his headache. He later became nauseated. In the latter part of the afternoon he sat up in a chair for awhile, but experienced such an aggravation of his headache while in an erect position, and became so dizzy and nauseous, and experienced such an intense, tingling, feeling all over his body, that he soon returned to bed. Dr. Brown again saw plaintiff on his routine hospital rounds and still diagnosed plaintiff’s headache and other symptoms as the usual post-lumbar puncture manifestations.
Dr. Beltran also saw plaintiff that day and directed that he be fed intravenously since he had not consumed sufficient food or fluids since his operation. Dr. Beltran too was of the opinion that plaintiff’s symptoms were those associated with having had a lumbar puncture.
9. On February 6, 1956, the third post-operative day, plaintiff’s complaints were generally the same. He was nauseous and refused dinner. He was again seen by Dr. Beltran who again directed that plaintiff be fed intravenously.
10. (a) On February 7, 1956, the fourth post-operative day, plaintiff was still suffering from headache and neck pains which kept him awake most of the night. Plaintiff was given medication at 5:30 in the morning for his pains but was unable to retain it at first. He did succeed in retaining a second dose 15 minutes later.
Dr. Brown saw plaintiff again that day and specifically noted that he had had a headache for the past 3 days, together with nausea and vomiting.
At the urgings of the nurses, pursuant to the doctor’s early ambulation orders, plaintiff did get out of bed at 6 p.m. with, however, the same unsatisfactory results as before. Since the operation, every time plaintiff got out of bed and assumed an erect posture, he became dizzy, faint, nauseous, and experienced a tingling sensation throughout his body. On each of these occasions he felt so ill that he found it necessary to return to bed as soon as possible. He found the supine position was more comfortable and relieved or eliminated his symptoms of headache, nausea, and dizziness.
*407 However, Dr. Brown felt tlrat, despite plaintiff’s symptoms, it was still advisable to encourage plaintiff to get out of bed as much as possible. Plaintiff’s symptoms of headache, dizziness, feeling faint, nausea, vomiting, loss of appetite, and tingling sensations, were of the type that not uncommonly follow lumbar punctures. True post-lumbar puncture discomfort is not dangerous and invariably disappears in time, varying with the individual patient. The relation to or the aggravation of the symptoms by the erect posture was typical of lumbar puncture aftermaths. Such symptoms are essentially postural in origin, increasing with the erect posture and being relieved by lying down. Dr. Brown felt that while plaintiff’s symptoms indicated the post-spinal headache type of discomfort, nevertheless as compared to the possible lethal effects of an embolus, ambulation was definitely advisable.
(b) During this day, plaintiff’s wife (who had visited plaintiff daily except for February 4) became concerned about plaintiff’s headaches, dizziness, vomiting, and inability to raise his head whenever he tried to sit up in bed. Plaintiff had not been able to eat, and his wife had had to shave him and assist in such other tasks as bathing him. She feared that plaintiff was not making a normal recovery. She discussed plaintiff’s condition and her concern about it with Dr. Brown who assured her, however, that there was nothing wrong with plaintiff, that his symptoms were not unusual ones after a spinal anesthesia, and that they sometimes last a week or even longer. He felt that plaintiff was too self-concerned.
11. (a) On February 8,1956, the fifth post-operative day, plaintiff was again seen by Dr. Beltran who changed the dressing on plaintiff’s wound. At that time, the wound had healed well. Since the operation, plaintiff has never experienced any trouble with the hernia.
During the early part of the afternoon, plaintiff, although he still did not feel like getting out of bed, concluded that since he was not, in his opinion, properly recovering, he was probably in error in resisting the doctor’s directions and the nurses’ urgings that he get out of bed more often. He thereupon decided to force himself to get out of bed and to stay out for a longer period of time. Accordingly, he rose, went to the ward lounge, and sat in a chair.
However, after sitting awhile, and around 2:30 p.m., plain *408 tiff suddenly became completely disoriented. He first saw flashing lights, and then his whole field of vision blacked out. He tried to get back to his bed, but could not see. He cried out for help, then lost consciousness and collapsed into a convulsive-like seizure. Thereafter, plaintiff fell into a disoriented, unconscious-like state which lasted for around 2 days.
Immediately after the seizure began, plaintiff was put back to bed and Dr. Brown summoned. Plaintiff was writhing around in bed at a rapid rate from one side to the other, was not able to understand anything, and could not cooperate in a physical examination. However, Dr. Brown examined him as best he could under the circumstances to determine whether plaintiff had suffered a cerebral accident. He checked plaintiff’s reflexes, and then his eyes with a flashlight. An inequality in pupil size or lack of reaction to light would be indicative of an organic, cerebral accident, as, would improper reflex • responses. However, the reflexes and eye reactions appeared to be normal. The muscle strength of plaintiff’s legs and arms was also checked without evidence of weakness in either extremity. There was no discernible -evidence of paralysis.
Dr. Brown had previously felt that plaintiff had been too self-concerned. Since his preliminary neurological findings were negative and he could detect no organic basis for plaintiff’s condition, he suspected that plaintiff might be suffering from an inorganic rather than an organic lesion, i.e., he had a mental breakdown, and that he should therefore be treated psychiatrically. The hospital did have on its staff a psychiatrist, Dr. Donald Meltzer, who was summoned by Dr. Brown.
In the meantime, plaintiff’s wife had come to the hospital to visit plaintiff. She arrived after plaintiff’s collapse and was not permitted to see him at that time. After Dr. Brown’s first examination of plaintiff and his tentative conclusion that plaintiff had suffered a mental collapse, he asked plaintiff’s wife whether plaintiff had ever before suffered any mental collapse. Dr. Brown stated that he thought plaintiff had just suffered one. Mrs. Mackie replied that plaintiff never before, had had any mental problems. Dr. Brown stated that he had sent for the staff psychiatrist to examine plaintiff but that in the meantime he wanted Mrs. Mackie to talk to her husband *409 and ask him a few questions involving herself and their children. Thereupon Mrs. Mackie entered the ward and talked to her husband along the suggested lines. However, plaintiff neither recognized her nor indicated any response to conversation about his children. The only discernible statements he made concerned pain he was experiencing. Thereupon, Mrs. Mackie reported to Dr. Brown that plaintiff failed to respond to her conversation.
Upon Dr. Meltzer’s arrival and observation of plaintiff, he suggested the administration of a drug (sodium amytal) to stop the convulsive seizure. Plaintiff’s wife was then told by Dr. Meltzer that plaintiff was in a state of shock and that he would be given medication which would put him to sleep and would probably bring him out of his then condition. She was told that, under the circumstances, there was no further need for her presence that day. Dr. Brown administered the sodium amytal at around 4 p.m. After a period of restless-mess, plaintiff did quiet down. That evening he was given a sleeping pill and slept well during the night.
As a result of Dr. Brown’s tentative conclusion that plaintiff required psychiatric treatment, with which Dr. Meltzer agreed, Dr. Meltzer thereafter assumed charge over plaintiff’s case.
(b) Plaintiff had in fact suffered a cerebral, organic, vascular accident.
12. The following day, February 9, 1956, plaintiff was for the most part still in an unconscious condition. He was irrational. He swallowed a small amount of fluid in the early morning but that evening was fed intravenously. His wife visited him in the morning but he still did not recognize her. The only rationality evident in his mumbling and rambling statements concerned the pain he was suffering.
Dr. Meltzer observed plaintiff during the day and, from plaintiff’s medical history and certain of the generally incoherent statements he was making, concluded that plaintiff was in a confused, hysterical, mental state, that he had a hypochondriacal preoccupation with certain body parts, including his head and neck, and that he probably had a pre-morbid personality which was schizoid.
Because of Dr. Meltzer’s statements the previous day to the *410 effect that he would prescribe medication that was designed to improve plaintiff’s condition, plaintiff’s wife was disappointed to find no substantial improvement. In her distraught concern for her husband’s welfare, and her disbelief that the cause of his condition was psychiatric, she turned for help and assurances to the naval installation in London to which he was attached. She telephoned the installation, reported her husband’s condition, and expressed her great concern. Thereupon, the installation asked its staff medical officer, Captain Hilton W. Rose, to look into the matter. Since the Navy had no hospital attached to this London installation, Dr. Rose’s duties were of an administrative nature. From time to time he would visit Navy officers and enlisted personnel at the Air Force Hospital, not in his capacity as a doctor, but simply to assure them and their families that the Navy had a continuing concern with their welfare.
Immediately upon Dr. Rose’s being advised, as a result of Mrs. Mackie’s call, that plaintiff had suffered a collapse, he called the Air Force Hospital and discussed plaintiff’s condition with Dr. Meltzer.
13. Early the next morning, February 10, 1956, around 8 a.m., Dr. Rose visited plaintiff in the Air Force Hospital. Dr. Rose asked him a few questions, to which plaintiff was unable to respond, although it did appear that he showed some signs of recognition. However, Dr. Rose still considered plaintiff to be in only a semiconscious state and quite irrational. It was his immediate conclusion (although seemingly unexpressed to anyone at the hospital) that plaintiff had suffered some kind of organic cerebral accident. After talking to Dr. Brown, and receiving assurances that the hospital was doing everything it possibly could for plaintiff, Dr. Rose left. Later that morning, plaintiff’s wife visited the hospital and was interviewed by Dr. Meltzer, who stated that "he was of the definite opinion that plaintiff’s difficulty was a mental one, based upon certain past events, although plaintiff’s wife stated that these events never before had appeared to cause plaintiff any mental disturbance. During that day, Dr. Brown removed the sutures from plaintiff’s wound.
Later that day, plaintiff’s condition appeared to improve. He became somewhat more in touch with reality. • His wife *411 visited him again at 4 p.m. Around 6 p.m., plaintiff appeared to be coming out of his coma-like state and for the first time definitely recognized his wife. Food was brought to plaintiff, but he was unable to feed himself, and his wife fed him.
At 9 p.m., plaintiff’s wife left and the nurses prepared plaintiff for bed. Although more alert and rational than he had been, he was physically helpless. In bathing him and brushing his teeth, the nurses likened his condition to that, of a 3-year old child.
14. On February 11, 1956, Dr. Meltzer again observed' plaintiff and found him still to be in a very confused mental state. He was able, however, to get out of bed and sit in a chair for an hour, as well as to feed himself. It was noted for the first time that plaintiff had difficulty in focusing his eyes. Plaintiff complained that he was blind in the right half of each eye and that each eye saw different pictures.
Plaintiff’s wife remained unconvinced that her husband had suffered a mental breakdown. She discussed her husband’^ condition with a friend in whose family there was a psychiatrist. Plaintiff’s friend mentioned the case to this psychiatrist who stated that he believed plaintiff should be examined! by a neurologist. He recommended two world famous London-neurologists, Sir Russell Brain, and Sir Charles Seamore.
15. On February 12, 1956, plaintiff was still disoriented! and confused. He was, however, able to feed himself and,, for the first time since his collapse, appeared to show some-interest in his surroundings and the other patients in the ward,, •engaging in some conversation with them.
16. On February 13, 1956, plaintiff was able to walk about, the ward for longer periods of time. He was also able to feed' himself, but still was greatly confused. He complained off half blindness in each eye. He evidenced poor coordination-in the movements of his right hand, finding difficulty in eating-with this hand. He also evidenced a loss of the power of" expression and comprehension (referred to medically as “aphasia”). Dr. Meltzer construed these manifestations as-symptoms of his psychiatric condition.
During the day, plaintiff’s wife discussed plaintiff’s case with Dr. Meltzer and expressed her concern over his failure-to show any marked improvement. She inquired about trans *412 ferring him to a private room. Dr. Meltzer recommended against this, however, stating that, since plaintiff’s difficulty was mental, it would be better for him to remain in the ward where he could be around other people.
17. On February 14, 1956, although plaintiff’s appetite improved, his basic condition remained unchanged.
During the day, plaintiff’s wife again discussed plaintiff’s case with Dr. Meltzer and informed him that she wanted to call in a neurologist. Dr. Meltzer assured Mrs. Mackie that he would have no objection whatsoever to a neurologist being consulted, and inquired whether she knew of any. She stated that Drs. Brain and Seamore had been recommended to her. Dr. Meltzer pointed out that these were expensive, private, specialists. She insisted, however, upon such a consultation and stated that, if necessary, she would raise the required funds by selling their home. Thereupon, Dr. Meltzer made an appointment for plaintiff to see Dr. Brain on February 23, 1956.
18. From February 14 to 22, 1956, plaintiff continued to be treated psychiatrically by Dr. Meltzer. On February 15 he expressed concern about his eyesight and on the 17th, requested an eye patch. He received medication for a headache. That day, Dr. Meltzer, in anticipation of plaintiff’s appointment with Dr. Brain on February 23, sent to Dr. Brain a summary of plaintiff’s case. That night plaintiff, with help, was able to go into the mess hall to eat. On February 18 he began walking with a bad limp. He had a tendency to drag his right foot. He was still in a confused state. For instance, he did not know the time of day, or the month of the year. Furthermore, he was badly depressed. His more noticeable organic difficulties led to an examination that day by Dr. Brown and another doctor on the hospital staff (a Dr. Hammond) . They gave him a general and routine reflex examination in an attempt to detect any abnormal neurological condition. However, they could find none. After February 18, plaintiff continued to take his meals in the mess hall, but suffered headaches and dizziness when he rose from his bed.
19. On February 22,1956, which was the last day plaintiff was in the Air Force Hospital, plaintiff’s wife, while at the hospital visiting her husband, again discussed plaintiff’s case with Dr. Brown, who stated he had examined plaintiff again, *413 that he could detect no neurological difficulty, and was convinced that Dr. Meltzer’s diagnosis was correct and that plaintiff’s difficulty was mental.
Plaintiff’s wife thereupon became concerned about keeping the appointment with Dr. Brain. She then sought the advice, by telephone, of Dr. Rose of the Navy, who advised her, however, to go through with the arrangements to have her husband examined by Dr. Brain.
20. On February 23,1958, plaintiff, with the aid of his wife, left the 7520th Air Force Hospital to keep their appointment with Dr. Brain at his office. Dr. Brain examined plaintiff, studied his case history, and concluded that plaintiff in all probability had suffered a cerebral accident of an organic nature. Plaintiff’s blood pressure was 145/95. Dr. Brain recommended immediate hospitalization for neurological observation, with plaintiff to be kept absolutely quiet and in bed to aid in the prevention of any further accidents of a similar nature. He so advised Dr. Meltzer that same day. He also advised Mrs. Mackie that if she wanted him to continue with the case, it was his recommendation that plaintiff go to the London Hospital in Whitechapel, which was where Dr. Brain handled his cases.
After the consultation, plaintiff’s wife, accompanied by plaintiff in a wheelchair, went to the naval installation to seek Dr. Rose’s advice. Dr. Rose advised her to follow Dr. Brain’s suggestions. Upon her agreement, Dr. Rose called the Commanding Officer of the Air Force Hospital, advised him of Dr. Brain’s tentative diagnosis, and stated that Mrs. Mackie wished to have her husband transferred from the Air Force Hospital to a private hospital for treatment by Dr. Brain. The Commanding Officer not only assented, but stated that the Air Force would defray all the expenses of plaintiff’s hospitalization and treatment by Dr. Brain.
Thereupon Dr. Rose arranged with Dr. Brain to have plaintiff admitted to the London Hospital. Plaintiff was admitted to that hospital the same day. All the -hospital and medical expenses in connection therewith were in fact defrayed by the Air Force.
21. (a) The following day, February 24, 1956, an electroencephalogram was made of the plaintiff, which indicated an *414 abnormality in the left hemisphere of his brain, it being most prominent, however, in the left temporal lobe. It was concluded on the basis thereof that plaintiff had a lesion which was probably of vascular origin.
(b) On February 28, 1958, a left carotid angiogram was made.[2] It was concluded on the basis thereof that plaintiff possibly had a small angiomatous malformation in the pineal region. On March 6, 1956, another left carotid as well as a vertebral angiogram was taken. This time it was reported that the left carotid angiogram showed nothing in the pineal region and that the vertebral angiogram was normal,
(c) Dr. Brain’s surgical colleague, Dr. D. W. C. North field, was uncertain about a “suspected appearance of an angioma-tous malformation,” (i.e., a tumor formation of blood vessels). He concluded, however, that he had localized a small hemorrhage in a certain region which was spreading deeply. He recommended against an operation as too dangerous. No operation was performed on plaintiff for his brain condition. Plaintiff was kept in bed for 2 weeks at the hospital without being permitted to get up.
(d) During his stay at the London Hospital, plaintiff’s blindness in the right half of each eye (hemianopsia) improved somewhat, his field of vision gradually filling out in the upper right quadrants.
(e) Plaintiff was discharged from the London Hospital on March 10, 1956. He was still technically under the jurisdiction of the 7520th Air Force Hospital in Ruislip. However,, the Navy determined to return plaintiff to the United States-for further observation and disposition at the Bethesda Naval Hospital, Bethesda, Maryland. As a result of this decision,, plaintiff was formally “discharged” from the 7520th Air Force Hospital on March 16, 1956. However, plaintiff never returned to that hospital after he left it on February 23, 1956, to visit Dr. Brain.
(f) The final report of the 7520th Air Force Hospital with respect to plaintiff’s case prepared shortly after March 16, 1956, a copy of which was also sent to the Navy, and which *415 was prepared after having received Dr. Brain’s conclusions, stated that:
Patient has symptoms consistent with a hemorrhage into the left parieto-occipital region, possibly from an angioma * * *.
Angiograms were inconclusive and the hospital [White-chapel] Neurosurgeon thought there was no indication for surgical exploration at present. * * * Owing to the risk of a further hemorrhage he was advised to avoid all forms of physical exertion. Travel by the air route was considered preferable.
A conclusive diagnosis was not reached at this stage.
22. (a) In connection with plaintiff’s return to the United ¡States, the question arose whether plaintiff should travel by ship or by airplane. Dr. Brain’s advice was sought. By letter ■of March 20, 1956, to the Commanding Officer of the 7520th Air Force Hospital, Dr. Brain rendered a report with respect to plaintiff’s case and advised travel by air. The letter read as follows:
Captain Mackie has now left the London Hospital. He improved considerably, but was still left with a right homonymous visual field defect involving chiefly the lower quadrants. The angiograms, which he has with him, showed that there had been no cerebral thrombosis, but the appearance was consistent with a haemorrhage into the left parieto-occipital region. There was nothing to show its source, but it may have come from a small congenital vascular abnormality. My surgical colleague, Mr. Northfield, thought that there was no indication for surgical exploration at present. The risk of a further haemorrhage, however, must remain, so I have advised Captain Mackie to avoid all forms of physical exertion.
I understand that he is shortly returning to the United States and it is a little difficult to know whether it would be better for him to go by sea or by air. One has to balance the risks of possible straining resulting from seasickness against the risks of the lowered atmospheric pressure in an aeroplane. On the whole I should think the air route is preferable.
. (b) On March 20, 1956, the naval authorities in London officially admitted plaintiff to the “sick list” with the diagnosis of cerebral hemorrhage. Because of Dr. Brain’s concern about possible strains on plaintiff incident to seasickness, plaintiff’s Navy record was examined to ascertain any indi *416 cation that plaintiff was susceptible to seasickness. Finding none, the Navy considered that, under the circumstances, plaintiff could safely return by ship. Plaintiff returned by Navy ship, which left England on or about March 28, 1956.
23. On April 6, 1956, plaintiff was admitted to the United States Naval Hospital, Bethesda, Maryland, where he was a patient in the Neurological Service, headed by Captain John E. Nardini. Plaintiff was under the particular care of two neurologists, Lt. Thomas J. Preziosi, and Lt. L. E. Kurth, who was the Assistant Head of the Service. Plaintiff was admitted to the hospital with the diagnosis of cerebral hemorrhage, the same diagnosis as the Navy had made in London.
24. At the Bethesda Naval Hospital plaintiff was given thorough physical examinations. He was, upon admission, found to be oriented, cooperative and intelligent. He was found to be suffering from half blindness in each eye, although the right upper quadrant in each blind half was improved. He had a muscular weakness in his right side. Difficulty in ability to calculate, to learn new tasks, to remember, and to live in accordance with an orderly pattern, was noted. The neurological examinations were otherwise normal.
A series of electroencephalograms were made. At the beginning they indicated a general abnormality “and a left occipital slow wave focus,” but they later showed progressive improvement. A review of the angiograms taken in the London Hospital was made and it was concluded that they showed no abnormality.
After some weeks in the hospital, his condition improved. The blindness in the right lower quadrant of the field of vision in each eye persisted. The muscular weakness in the right side of his body disappeared. There was improvement in his ability to calculate, learn new tasks, remember, and live in an orderly fashion.
Psychological studies were made after 8 weeks of hospitalization. Although they showed plaintiff to be a man of superior intelligence, they also indicated a discrepancy “between motor performance and verbal performance” as well as “some difficulty in his ability to learn new tasks quickly.”
25. (a) It was concluded that further studies of plaintiff’s case were not indicated and that plaintiff should be presented' to a Board of Medical Survey. In connection therewith, *417 plaintiff’s case was first reviewed in a series of conferences of the hospital’s staff neurologists. The conclusions of the staff resulting from these conferences were subsequently set forth in the Report of the Board of Medical Survey as follows:
The patient was presented and the case was reviewed in a series of conferences of staff neurologists and it was the consensus of opinion that the patient had suffered damage to the parieto-occipital region of the left hemisphere.
It was felt that there were two plausible explanations for this at the present time namely thrombosis secondary to hypotension or embolization. It was thought impossible to accurately state which of these was the correct one but the more likely was thought to be embolic phenomena arising from the operative site. * * * It was agreed that the patient was showing progressive steady improvement and would continue to do so.
(b) As a result of these staff conference conclusions, the hospital’s admittance diagnosis of cerebral hemorrhage was, on June 6, 1956, formally “changed by reason of error” to “Embolism * * * cerebral left parieto-occipital complex of vessels, cause unknown.”
(e) On June 13, 1956, a Bethesda Naval Hospital Board of Medical Survey, consisting of Drs. Nardini, Preziosi, and Kurth, made its report on plaintiff to the Navy Bureau of Medicine and Surgery. The Board reviewed the records and conclusions of the 7520th Air Force Hospital, the London Hospital, and Dr. Brain. It noted that “It was the opinion of both Dr. Russell Brain and his surgical colleague that the patient had suffered from a small intracerebral hemorrhage, possibly secondary to an angioma”; that “There was no prior history of neurologic symptoms and the patient had been in excellent health until the time of admission to the” Air Force Hospital; and that “Past history and family history was noncontributory and review of systems revealed no evidence suggestive of systemic disease.” It further reviewed the tests that had been given to plaintiff, the findings, his difficulties, and his improvement, as set forth above. It also set forth, as above quoted, the staff conferences, the staff conclusion that plaintiff had suffered an embolism, and the hospital's change of diagnosis, by reason of error, from hemorrhage to embolism. The report then closed by stating that the Board agreed with *418 the embolism diagnosis and recommended that plaintiff be retained for further observation and treatment.
(d) On June 19, 1956, the Commanding Officer approved the Board’s recommendation and on July 3, 1956, the Chief of the Bureau of Medicine and Surgery also approved the recommendation.
26. (a) In August 1956, Dr. Preziosi noted that plaintiff was progressing satisfactorily. On August 17, he ordered a recheck of plaintiff’s visual fields. His “Bequest” to the Department of Ophthalmology for such a recheck indicated a “provisional diagnosis” of plaintiff’s condition as “Hemorrhage occipital parietal left.”
(b) In September 1956, Dr. Preziosi reported that plaintiff was getting along well and that his “visual fields show further improvement.”
27. (a) In October 1956, the Naval Plospital discovered that plaintiff had operable rectal cancer. On October 22, 1956, plaintiff was transferred from the Neurological Service to the Surgical Service for an operation. The neurological staff was somewhat concerned that plaintiff’s cerebral condition may have had some relationship to a low blood pressure condition that followed or was in some way related to his hernia operation anesthesia. It felt that the Surgical Service be so advised so that it could govern itself accordingly in the choice of an anesthetic for the cancer operation, and, on October 22, 1956, when plaintiff was transferred from it, the Neurological Service did so advise the Surgical Service in the form of a “Clinical Record — Doctor’s Progress Notes” by Dr. Preziosi which read as follows:
Patient is being transferred to surgery for treatment of adenocarcinoma of the rectum. At the present time he shows little if any neurologic residue except for the right homonymous inferior quadrant anopsia. It is the opinion of the neurological staff that any causal relationship between the cerebral lesion and the rectal malignancy is remote. The mechanics of the onset of his previous lesion appeared to have been related to postural hypotensive [3] effects in part following or related to the anesthesia.
Hypersensitivity to local anesthetics may play a role. It is therefore suggested that caution be exercised in the *419 choice and use of anesthetic agents for surgery. An EEG has been requested to be done on October 24, 1956.
(b)Plaintiff’s cancer operation was successfully performed on October 26, 1956. Such operation has had no effect upon plaintiff’s neurological condition.
28. (a) Because of this new cancer development, plaintiff, on November 9, 1956, appeared before a second Board of Medical Survey, which again recommended retention in the hospital for observation and treatment.
(b) By December 1956, plaintiff had recovered from the surgery and its post-operative effects. However, during that period and continuing into February 1957, plaintiff showed little neurological change. At this time plaintiff was under the joint jurisdiction of the Department of Surgery and the Department of Neurology. Repeated neurological examinations revealed no further evidence of the right sided weakness previously noted but still showed defects in his right visual field. His memory difficulty continued, which became emotionally disturbing to plaintiff.
(c) On February 14, 1957, the Department of Surgery concluded that plaintiff’s surgical lesion had been handled adequately. However, because of plaintiff’s mental state, it was decided to obtain the opinion of the Department of Psychiatry. This department found that plaintiff was still suffering from a marked memory difficulty and that he was unable to solve simple mathematical problems. It further concluded that these organic residuals from his vascular lesion had resulted in severe impairment of adjustment. Although it was felt that plaintiff’s memory and visual defects, mathematical inabilities, and difficulties in adjusting to his neurological defect, indicated that plaintiff still had considerable residual from his cerebral condition, it was nevertheless concluded that plaintiff’s neurological condition had changed little since his last Board of Medical Survey Report of November 9, 1956, and that plaintiff did not require further hospitalization.
(d) On March 25, 1957, a Clinical Board met at the hospital to consider plaintiff’s case. It reviewed the reports of the two Boards of Medical Survey and the then current conclusions of the Departments of Surgery, Neurology and Psychiatry, and recommended that plaintiff appear before a *420 Physical Evaluation Board with a diagnosis of embolism and of colectomy (excision of a portion of the colon).
29. (a) On April 11, 1957, plaintiff appeared before a Physical Evaluation Board convened at the Bethesda Naval Hospital. The only witness who testified was Dr. Kurth, who was one of the doctors who had treated plaintiff and followed his case ever since his admission to the hospital. Dr. Kurth testified that plaintiff's neurological condition had stabilized and had been stable for approximately 6 months; that his visual defect was permanent; that his difficulties in memory ■and ability to calculate were the results of his brain lesion, which represented permanent brain damage; that over the years the portions of the brain which are intact can compensate in some degree for the functions affected by the permanently damaged part, so that there might be a mild improvement in such mental defects, improvement which would, however, be minimal at best; that he could not in the future hope to hold gainful employment which required marked concentration of any sort; and that plaintiff would experience extreme difficulty in adjusting to any kind of new situations, which would necessarily severely impair his adjustment to ■civilian life.
The Board thereupon recommended that it be found that (a) plaintiff was unfit for duty by reason of physical disability; (b) the diagnosis was embolism and colectomy; (c) plaintiff’s disability, in accordance with the standard schedule ■of rating disabilities then in use by the Veterans Administration, was 100 percent (a 100 percent rating being assigned to the embolism, 100 percent to the malignancy difficulty, and ■30 percent to the impairment of his field of vision); and (d) that plaintiff’s disability was permanent.
(b) On June 4, 1957, the Navy’s Physical Review Council, after having reviewed the recommendations of the Physical Evaluation Board, advised the Secretary of the Navy that it concurred in the recommended findings of the Board except that it felt that plaintiff’s disabilities should be more properly rated under the VA Code as follows: (a) the visual defect (“homonymous hemianopsia”) — 30 percent; “psychasthenia,[4] *421 with severe industrial inadaptability” — 50 percent; the cancer condition (“New growth, malignant, rectosigmoid”) — 100 percent.
30. On July 1, 1957, plaintiff was placed on the Navy’s Temporary Disability Retired List by reason of physical disability, with a rating of 100 percent in accordance with the provisions of the Career Compensation Act of 1949, as amended, as a result of the Navy diagnosis of embolism and ■colectomy. Since then, plaintiff has been receiving disability retired pay.
31. (a) On August 2, 1957, there was introduced in the Senate, 85th Congress, 1st Session, Senate Bill S. 2682, which read as follows:
A Bill
For the relief of T. R. Mackie
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to T. R. Mackie the sum of 830,000 as additional compensation for permanent injuries suffered to his brain and eyesight as the result of his blood pressure dropping too low during the course of an operation performed on him in a United States Air Force hospital in Ruislip, England, while he was serving as a captain in the United States Navy. The payment of such sum shall be in addition to any other benefits the said T. R. Mackie may be entitled to receive as the result of such injuries: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
(b) On August 20, 1958, the Senate, 85th Congress, 2d Session, agreed to Senate Resolution 381, which read as follows:
Resolved, That the bill (S. 2682) entitled “A bill for the relief of T. R. Mackie”, now pending in the Senate, together with all the accompanying papers, is hereby re *422 ferred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimant.
(c) Plaintiff’s original petition herein was filed on November 6, 1958. Included in the relief sought was judgment for $100,000 as damages caused by the alleged malpractice of Dr. Brown in permitting plaintiff’s blood pressure to drop below normal limits during the course of plaintiff’s hernia operation, which drop was allegedly the cause of plaintiff’s brain damage.
(d) After pretrial proceedings, including two pretrial conferences, the taking of testimony in this case commenced on December 7, 1959.
32. On June 1, 1960, while the trial of this case was still in process, and after the completion of plaintiff’s case in chief and defendant’s testimony, there was introduced in the Senate, '86th Congress, 2d Session, Senate Bill S. 3613, which read as follows:
A Bill
For the relief of T. R. Mackie
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to T. R. Mackie the sum of $100,000 as additional compensation for permanent injuries suffered to his brain and eyesight as the result of improper care preceding, during, and following an operation performed on him while he was serving as a captain in the United States Navy, in a United States Air Force hospital in Ruislip, England, and including, but not limited to the lowering of his blood pressure, the failure of the Air Force doctors to recognize the symptoms which preceded a cerebral accident, the misdiagnosis and improper treatment rendered him after the cerebral accident, the failure to secure proper consultations from the available neurologists in the area, and the failure to, at *423 any time from the beginning of the preoperative procedures through the last day in said hospital, to correctly recognize the symptoms or to correctly diagnose his condition. The payment of such sum shall be in addition to any other benefits the said T. R. Mackie may be entitled to receive as the result of such injuries: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof it shall be fined in any sum not exceeding $1,000.
No action was, however, taken upon this bill.
33. (a) On January 10, 1961, there was introduced in the Senate, 87th Congress, 1st Session, Senate Bill 327, which was identical with S. 3613 and which had been introduced in the 86th Congress (finding 32).
(b) On April 18, 1961, the Senate, 87th Congress, 1st Session, agreed to Senate Resolution 123 which read as follows:
■Resolved, That the bill (S. 327) entitled “A bill for the relief of T. R. Mackie”, now pending in the Senate, together with all the accompanying papers, is hereby re-, ferred to the Court of Claims as a supplement to S. 2682, Eighty-fifth Congress, referred to the Court of Claims by S. Res. 381, Eighty-fifth Congress; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due from the United States to the claimant.
(c) Plaintiff’s amended petition was thereupon filed herein, on July 7, 1961. Included in the relief sought was judgment for $100,000 as damages caused by the alleged aforesaid malpractice of Dr. Brown, as well as the alleged malpractice of the other Air Force physicians and attendants at the Air Force Hospital who treated or attended plaintiff for their failure to recognize the symptoms preceding plaintiff’s cerebral accident, their misdiagnosis of plaintiff’s condition, their rendering improper treatment, and their failure to secure *424 proper consultations and advice from available neurologists in the area.
(d) The trial herein, after further preliminary proceedings in the nature of additional pretrial proceedings, thereafter proceeded to completion.
34. (a) In the meantime, on May 1, 1962, plaintiff, represented by counsel,- appeared before a Physical Evaluation Board to reevaluate plaintiff’s case, since he had previously been placed only on the temporary retired list. At the hearing, Dr. Robert Cohn, a neurologist who had examined plaintiff and was familiar with his case, testified on plaintiff's* bebalf. He testified, among other things, that plaintiff was still half blind in each eye and that it would be most unlikely-that he would ever recover from his vision and memory defects ; that while plaintiff’s “stroke” no longer affects his motor system reflexes, he nevertheless does have some motor difficulties, such as an inability to handle tools; and that plaintiff’s-difficulties would make it almost impossible for him to hold' a job.
Plaintiff’s counsel, Rear Admiral Charles S. Stephenson,. Medical Corps, United States Navy (Retired), who also acted' as plaintiff’s co-counsel in the instant proceedings, referred* in summation to the diagnosis and ratings under which plaintiff was then receiving retirement pay and stated that it was-his belief that plaintiff never did have an embolus of the-brain because it would not have been possible for the embolus,, coming from the lower part of plaintiff’s body, to reach the-brain. It would first, he stated, have to go through the lungs,, where it would be captured.
The Board, after deliberation, made the following recommended findings: (a) that plaintiff was unfit for duty due to-embolism and cancer disabilities, and that his disability berated as 80 percent in accordance with the standard Schedule-for Rating Disabilities in then current use by the Veterans-Administration for the following (1) impairment of field off vision (i.e., the half blindness “homonymous hemiaopsia”)— 30 percent, (2) “Chronic brain syndrome associated with-circulatory disturbance (embolism of left occipito-parietaP complex of vessels) with severe impairment” — 70 percent,. (3) his condition following the cancer operation — 20 percent;; and (b) that plaintiff’s disability was permanent.
*425 (b) On May 22, 1962, the Navy Physical Review Council advised the Secretary of the Navy that it concurred in the recommended findings of the Physical Evaluation Board and that plaintiff should be removed from the Temporary Disability Retired List and placed on the Permanent Retired List.
(c) On June 11, 1962, the findings of the Physical Evaluation Board, as concurred in by the Physical Review Council, were, by action pursuant to the direction of the Secretary of the Navy, approved, and plaintiff was accordingly removed from the Temporary Disability Retired List and permanently retired for physical disability with a combined 80 percent rating under the VA schedule for rating disabilities.
His disability retirement is 75 percent of his basic pay.
35. All the doctors who have concluded that plaintiff suffered an organic cerebral accident agree that it was due either to an embolism, a hemorrhage, or a thrombosis. The following five doctors who expressed expert opinions testified in this case:
(1) Dr. John E. Nardini. At the time he testified, he was a captain, Medical Corps, Bureau of Medicine and Surgery, United States Navy. He was the head of the Neuropsychiat-ric Service at the Bureau. His specialties are both psychiatry and neurology, with his primary field being psychiatry. When plaintiff was at the Bethesda Naval Hospital, he was the Chief of the Neuropsychiatric Service at the hospital. He participated in the June 13, 1956, Board of Medical Survey Report (finding 25(c)) fixing embolism as the cause.
(2) Dr. Francis Kruse, Jr. At the time he testified, he was a major, Medical Corps, United States Air Force. He was graduated from the University of Colorado Medical School in 1950. He interned at the Army Letterman Hospital for 2 years (1950-51) and for 3 years (1951-54) was assistant resident, resident, and instructor of neurology. He then served as assistant, and then chief, of the section of neurology at Parks Air Force Base (1954-57). Since 1957, he has been staff neurologist, Neuropathology Branch, Armed Forces Institute of Pathology. He is a diplómate in neurology of the American Board of Psychiatry and Neurology.
(3) Dr. Webster Clay Brown, the surgeon who operated' on plaintiff. He was graduated in 1950 from Meharry Medical College, Nashville, Tennessee, interned at Coney Island *426 Hospital in Brooklyn, N. Y., and spent 4 years as a resident in surgery at Meharry Medical College. He was inducted into the Air Force in August 1954 and assigned to the 7520th United States Air Force Hospital in Ruislip, as Chief of the Surgical Service, where he remained 2 years. At the time he testified he was in private practice in Portland, Oregon.
(4) Dr. Harold Stevens. After obtaining B.S., M.A. and Ph.D. degrees from the University of Pennsylvania, he was graduated from the University’s Medical School in 1941 and then interned at the University of Michigan Hospital. He then did graduate work in neurology at Columbia University and George Washington University. He is certified in both psychiatry and neurology by the American Board of Psychiatry and Neurology, although he confines his practice to neurology. At the time he testified, he was a Professor of Neurology at the George Washington University School of Medicine and the head of its Department of Neurology.
(5) Dr. D. A. Murray. At the time he testified, he was a commander, Medical Corps, Bethesda Naval Hospital, where he was Chief of the Anesthesiology Service. This hospital is a 900-bed hospital where 3,000 to 4,000 anesthetics are administered annually. He had previously headed the same Service at the second largest naval hospital, Portsmouth, Virginia, with 1,200 beds and where 5,000 to 6,000 anesthetics are administered yearly. He is certified by the American Board of Anesthesiology and is a fellow of the American College of Anesthesiology. He interned and had residences in at least five hospitals and was a surgeon on a British ship during World War II.[5]
36. Embolism. As shown, this is still the Navy’s official diagnosis under which plaintiff was both temporarily (finding 30) and permanently retired (finding 34(c)).
An embolus gives no prior symptomatic warning. It strikes suddenly. It is a recognized hazard of surgery (finding 7). If this is what plaintiff suffered, no doctor or staff member at the Air Force Hospital is shown to have done anything that contributed to its cause, or failed to do anything that could have prevented it. Except for early ambulation, it cannot be avoided.
*427 Drs. Kruse, Brown, Stevens, and Murray all agreed that the possibility of an embolus being the cause of plaintiff’s cerebral accident is very remote. As set forth in finding 7, it would hardly be possible for the blood clot forming in a leg vein or in a vein leading from the operative site [6] to get out of the lungs, and then back into the left auricle of the heart, then pumped into the arterial system, and then to the brain. The embolus would almost certainly first be trapped in the lung capillaries which are so small it would be almost impossible for an embolus to escape. The theoretical possibility that the clot could pass, through an opening in the heart wall separating the right and left sides, directly from the right side to the left without first going through the lungs, is so remote and improbable as not to warrant serious consideration. Plaintiff’s medical record never indicated such a heart defect. Similarly, the unusual situation of an embolus starting at the left side of the heart and then going directly into circulation could also only result from some underlying abnormality of the heart vessel caused, for instance, by rheumatic fever, a condition not indicated in plaintiff’s case. And the theoretical possibility of the clot moving from the leg or pelvic region directly into the complex vein system of the spine and up to the brain without first entering the heart and lungs at all is even more remote.
The Navy records do not indicate the basis for the conclusion of the doctors at the Bethesda Naval Hospital for the embolism diagnosis. Nor did Dr. Nardini, who participated in the staff conferences which arrived at such diagnosis and in the ultimate Navy decision formally to change the original diagnosis of hemorrhage to that of embolism, explain, in his •testimony, the underlying basis for such conclusion or the reasoning behind it. He had no recollection of such reasoning at the time, although he did state that if an embolus is ■small enough, it could pass out of the lungs into the left part -of the heart and then out into the arterial circulation and up to the brain. He also postulated the other possibilities of a small clot originating from a congenital abnormality lying within the left side of the heart as well as the direct spinal *428 route. As shown, all the other doctors rejected all these theories as being quite impossible.
Dr. Nardini explained that any kind of a diagnosis of the cause of plaintiff’s condition is completely speculative and that, as a practical matter, it was of little importance to the Navy whether, for retirement purposes, the diagnosis was, officially, embolus, thrombosis, or hemorrhage. The important fact was that plaintiff did have a disabling, organic, brain condition. All the staff doctors were uncertain as to the correct diagnosis, there were differing opinions, they had to settle on one, and they ultimately settled on the embolus one for retirement purposes. Actually the whole matter was quite academic to them because, whether plaintiff’s condition was caused by an embolus, a hemorrhage, or a thrombosis (all three were considered) the treatment, general rest, would be the same and disabling brain damage would justify retirement regardless of the specific diagnostic label.
As shown, the Board of Medical Survey in which this witness participated considered that the two most plausible explanations for plaintiff’s condition were “thrombosis secondary to hypotension or embolization” (finding 25 (a)). Thus, they considered hemorrhage the least likely of the three possibilities. Although, for unexplained reasons, they ultimately selected embolus, Dr. Nardini did testify that the chief cause of a condition such as plaintiff has would be considered by the medical profession to be a cerebral thrombosis.
On the entire record, it must be concluded that embolism is the least likely of the three possibilities and that it was, therefore, not the cause of plaintiff’s cerebral accident.
37. Hemorrhage. A cerebral hemorrhage is bleeding due to a tear, rupture, or defect in a blood vessel which results in blood flowing into the surrounding soft, watery, brain tissue and depriving such area of its oxygen supply (anoxia). This was the Bethesda Naval Hospital’s admittance diagnosis (finding 23), which followed the diagnosis of the London naval authorities in admitting plaintiff to the sick list (finding 22 (b)), and which in turn followed what appeared to be Dr. Brain’s diagnosis (finding 22(a)).
As is true of an embolus, a brain hemorrhage gives no prior symptomatic warning. It strikes suddenly and there is no *429 way its occurrence can be predicted. Unlike an embolus, however, it would have no relationship whatsoever to the fact that the patient had undergone surgery, nor would any prior event, occurrence, or condition at the hospital be of any significance. Under the hemorrhage theory, the occurrence of the cerebral accident while plaintiff was in the hospital was purely coincidental and would have happened at that time regardless of where he might have been or what he was doing. Its most common cause is a congenital vascular abnormality, such as thin walls which may rupture. If plaintiff did suffer a brain hemorrhage, no doctor or staff member at the Air Force Hospital could have done anything that contributed to its cause or that would have prevented it.
On the basis of the record herein, the hemorrhage diagnosis does not lend itself to acceptance. The hemorrhage theory is strengthened by what has been construed to have been the diagnosis of Dr. Brain of London, who is conceded to be an eminent neurologist. Yet, it is not entirely clear either that that was in fact Dr. Brain’s positive diagnosis or, if so, what was the basis therefor. Neither Dr. Brain nor any of the other doctors associated with him on plaintiff’s case testified herein. After receiving Dr. Brain’s conclusions, the Air Force Hospital, on March 16, 1956, felt that, while Dr. Brain had concluded that plaintiff’s symptoms were “consistent with a hemorrhage”, nevertheless “A conclusive diagnosis was not reached at this stage” (finding 21(f)). Dr. Brain’s letter dated March 20, 1956, to the Air Force Hospital repeats that: “The angio-grams * * * showed that there had been no cerebral thrombosis, but the appearance was consistent with a haemorrhage into the left parieto-oceipital region” (finding 22(a)). Yet, the results of all the tests performed on plaintiff at the London Hospital by Dr. Brain and his associates, including the angio-grams, which are set forth in a hospital report dated March 28, 1956, prepared by Dr. G. Strube, “House Physician to Sir Russell Brain”, do not seem to support this conclusion. Although a left carotid angiogram taken on February 28, 1956, is noted as showing “Possibly a small angiomatous malformation in the pineal region,” the notation for another left carotid angiogram performed on March 6, 1956, is “Nothing seen in pineal region,” and a vertebral angiogram performed *430 the same day is noted as being “normal” (finding 21(b)). Dr. Stevens, who diagnosed the cause of plaintiff’s condition as a thrombosis, testified that these negative angiograms, particularly the more comprehensive vertebral one, definitely precluded a vascular malformation such as a hemorrhage. And yet, at the close of the report, after stating that Dr. Northfield “could not be certain about suspected appearance of an angiomatous malformation” (evidently as a result of the later normal angiograms), Dr. Strube states that: “He [Dr. Northfield] localized a small haemorrhage to the region of the upper lip of the left calcanian fissure, subcortical and spreading deeply.” In view of the normal angiograms, no basis whatever is shown for this statement.
The uncertainties involved in, and the unanswered questions relating to, this final report of the London Hospital investigations, the seeming lack of a definite hemorrhage diagnosis by Dr. Brain and instead the use of the “consistent with” language, and the failure of the Air Force Hospital, after the receipt of Dr. Brain’s conclusions, to construe the results thereof as amounting to a definite hemorrhage diagnosis, all serve to weaken the contention that plaintiff suffered a brain hemorrhage if such contention is based on the theory that Dr. Brain so found.
Drs. Kruse, Brown, and Murray, testified that in their opinion the most logical diagnosis was cerebral hemorrhage. Of these, however, only Dr. Kruse is a neurologist. They all laid special emphasis upon the suddenness of the accident. They did not construe plaintiff’s symptoms after the operation and up to the collapse on the fifth day thereafter as anything more than the usual post-lumbar manifestations, and in no way indicative of the possibility of a thrombosis (a conclusion disputed by Dr. Stevens and seemingly by the Bethesda Naval Hospital doctors). Dr. Murray relied heavily on Dr. Brain’s diagnosis and the angiograms as interpreted by Dr. Brain in his letter of March 20, 1956 (finding 22(a)).
As shown, the Bethesda Naval Hospital doctors considered hemorrhage to be the least likely of the three possibilities. After accepting that diagnosis upon plaintiff’s admittance, they formally changed it “by reason of error.” After a complete study of plaintiff’s records, including Dr. Brain’s investí- *431 gations and the reports of his assistants, as well as their own studies, they concluded that “there were two plausible explanations for this at the present time namely thrombosis secondary to hypotension or embolization” (finding 25(a)).
On the entire record, the hemorrhage theory, although more logical than that of embolism, is, at least as compared with the more plausible thrombosis diagnosis, weak.
38. Thrombosis. A thrombosis is a blood clot that fomis within a blood vessel, closing it. A lowered blood pressure (hypotension) can cause a thrombosis. The blood flow will, due to the decreased pressure, slow up and ultimately clot. Thrombosis of a cerebral vessel can occur after a drop in blood pressure during surgery. The condition becomes apparent in the recovery room where consciousness will not be recovered normally and paralysis of one side of the body becomes apparent. Plaintiff showed no evidence of having suffered such a thrombosis due to any drop in blood pressure before or during surgery, or while in the recovery room shortly after surgery.
On occasion, patients will after surgery experience transient hypotension precipitated by assuming the erect posture. After a period of time, this can eventuate in a thrombosis. In such instances, the patient, already experiencing decreased blood pressure from lying in bed, experiences a further drop when he assumes an erect posture (postural hypotension), and develops symptoms of decreased cerebral blood flow (hypoxia). There will be continued or repetitive manifestations of these symptoms every time the erect posture is assumed until there is a complete closure of one of the brain blood vessels, resulting in permanent damage to the brain.
Dr. Stevens testified that, considering the train of events herein involved, plaintiff’s case was a classical example of these symptoms and condition and, in his opinion, this is plainly what plaintiff experienced. It was his opinion that, in view of the sequence of surgery, the typical repetitive symptoms thereafter of decreased cerebral blood flow every time plaintiff assumed the erect posture, and finally the collapse caused by the complete closure of the blood vessel, all of which are recognized by neurologists as constituting the “not too rare” phenomenon of cerebral thrombosis, the other *432 suggested explanations of hemorrhage and embolism are not plausible. He further felt that the normal angiograms performed pursuant to Dr. Brain’s orders, especially the more comprehensive vertebral one, precluded, in view of their failure to disclose any vascular malformation, the conclusion that plaintiff suffered a hemorrhage.
The logic of this diagnosis is supported by the series of repetitive manifestations which actually took place in plaintiff’s case after his operation oh February 3 and up to the accident on February 8. It is the only one of the three diagnoses which gives any recognition or significance to the intermittent, repetitive, transient attacks plaintiff had prior to his collapse on February 8. The testimony of Dr. Stevens, an eminent, practicing, neurologist, that plaintiff’s pre-collapse symptoms were the classical transient hypotension or hypoxia ones eventuating in thrombosis, that he was familiar with other cases exhibiting the same train of events as plaintiff’s, and that the condition is well-known to neurologists and is “not too rare”, is entitled to the greatest weight. Dr. Kruse’s, Dr. Brown’s and Dr. Murray’s conclusions that plaintiff did not suffer a thrombosis are based upon the theory that plaintiff’s pre-collapse symptoms were only post-lumbar manifestations. Dr. Kruse failed to consider the possibility of transient hypotension. He did not even mention it (possibly due to the circumstance that he testified before this diagnosis was offered by Dr. Stevens). Both he and Dr. Nardini associated thrombosis principally with older persons who have some degree of arteriosclerosis and suffer a blood clot as a result of lowered blood pressure during sleep. Dr. Brown, who is not a neurologist and therefore not an expert in this field, at least recognized that there was such a condition as transient hypoxia. Dr. Murray conceded that plaintiff’s symptoms could have been those of a vascular hypo-tension. Transient hypoxia is a problem basically in the field of neurology. Dr. Nardini conceded that statistically, the major cause for conditions such as are herein involved would be cerebral thrombosis, a primary factor in which would be postural hypotension, and that while it most frequently happens to older persons when they first rise after sleeping, it is not a wholly unusual complication even in the non-aged after surgery.
*433 The logic of this diagnosis is further strengthened by the blood pressure considerations relating to plaintiff’s case. The hypoxia (decreased oxygen) condition is brought about by decreased blood flow to the brain. After one lies flat in bed, assuming an erect posture results in gravity pulling the blood away from the head and to the feet. This imposes a burden on the automatic responses which occur to maintain the blood pressure. The ordinary mechanisms of the body in the normal, average person usually effect such correction without difficulty. A reflex operation is triggered which keeps the blood running up back to the head, as a preferential matter. The brain must at all costs be supplied with blood. Because of the stress of surgery and the lengthened periods of lying flat both before and after surgery, a more than normal burden is placed on the automatic blood pressure maintenance responses. If the reflex machinery does not go into action properly, gravity keeps the blood pulled away from the brain, and the patient collapses. A person whose history prior to the operation indicates a susceptibility to blood pressure drops would be specially vulnerable to post-operative transient hypoxia.
Even considering the sedation drugs previously administered, plaintiff’s 90/40 blood pressure reading at 9 a.m. in the operating room (finding 5(a)) represented an abnormal drop from his pressure of 110/74 taken the night before (finding 4(a)) and 118/76 in the recovery room (finding 6(a)) which in themselves would be considered low normal. Thus plaintiff, a relatively low blood pressure person, indicated a susceptibility or capability of rather sharp blood pressure drops. While the entire blood pressure ranges did not fall into the area which would make the performance of the operation inadvisable, especially in view of the rise successfully effected by the ephedrine sulphate and the maintenance of the raised pressure during the course of the operation, the rather sharp drop to 90/40 did indicate the type of person plaintiff was insofar as susceptibility to such drops is concerned, i.e., one with vasomotor instability.[7] Patients susceptible to drops in blood pressure, such as plaintiff indicated, require careful post-operative scrutiny. Therefore, the now *434 evident sharp drops in pressure he did experience on assuming the erect posture after the surgery would not have been surprising to a trained neurologist familiar with this condition generally and the special susceptibility to it which a person of plaintiff’s history indicated. Plaintiff’s history of headache, nausea, vomiting, dizziness, and body tingling, are all symptoms of post-operative transient hypotension.
Were this condition recognized, recumbency might well have prevented it. It is one situation that does not call for early post-operative ambulation. The treatment is to get the patient up very gradually and briefly and then immediately put back to bed if the symptoms arise, extending the out-of-bed period longer each day, if possible. Sometimes binders are put on the patients’ legs, or even as high as the abdomen, to prevent the pulling of the blood down to the legs.
Because of the similarity of the symptoms involved to those of post-lumbar puncture, it is difficult for general practitioners or surgeons to recognize it. Neurologists are, however, normally familiar with and concerned about the problem. Had a competent and experienced neurologist been called in for consultation in plaintiff’s case prior to his collapse, his treatment would in all probability have been reversed. Blood pressure readings would have been taken in recumbent position, and immediately thereafter, in standing position. A discrepancy, plus the symptoms, would have resulted in delaying ambulation. Instead of being ordered, as part of early ambulation, to assume the erect posture, as plaintiff was, with his collapse occurring during the one time he persisted in remaining erect for a period of time, he would have been ordered to continue to lie in bed, and the gradual getting out of bed, plus leg binder, treatment would have been ordered.
Thus, in view of the actual events, i.e., the surgery, the symptoms and the blood pressure history, the acceptance of the firm opinion of Dr. Stevens that plaintiff experienced a cerebral thrombosis is, on this record, compelled. It seems much more logical than the hemorrhage diagnosis, which ignores the fact that plaintiff had surgery or the symptoms thereafter. At least the embolus diagnosis does take into consideration the fact that plaintiff did have surgery shortly prior to the collapse.
*435 As noted, the Bethesda Naval Hospital neurologists, at the time they rejected the hemorrhage diagnosis, recognized the plausibility of the “thrombosis secondary to hypotension” diagnosis (finding 25(a)), and when they were later preparing plaintiff for his cancer operation, they specifically warned the surgeons (despite their official embolus diagnosis) that plaintiff’s difficulty appeared to be related to postural hypotension (finding 27(a)).
It is true that Dr. Brain reported to the Air Force Hospital in London (finding 22(a)) that the angiograms taken at the London Hospital “showed that there had been no cerebral thrombosis.” However, the basis for this conclusion is nowhere explained. As shown, the entire matter of these angio-grams is puzzling. Inexplicably, as Dr. Stevens pointed out, they seem to be the basis for Dr. Brain’s hemorrhage diagnosis despite the fact that they appeared to be normal.
On the basis of the entire record, the diagnosis of cerebral thrombosis is, for all of the above reasons, the most plausible.
39. There is no indication that there were deficiencies in Dr. Brown’s administration of the spinal anesthesia, or the nurse-anesthetists’ administration of the general anesthesia. Nor is there any indication that plaintiff had any kind of hypersensitivity to such anesthetics. Such hypersensitivity is most uncommon and there is nothing in the record to indicate that plaintiff suffered any kind of reaction symptomatic thereof.
The usual slight drop in blood pressure caused by the administration of the spinal anesthesia was here effectively negatived by the ephedrine sulphate. Plaintiff’s blood pressure during the course of the operation, taken every 5 minutes, was steady and showed no abnormal drops (one reading showed a slight rise), as was true of his pressure after the operation in the recovery room. The effect of the anesthesia is dissipated within a few hours after the operation when it can no longer affect the circulation.
40. Plaintiff’s visual defect is permanent. It limits his ability to move about without walking into objects. He cannot safely drive an automobile and, after a period of attempting to do so but meeting with an accident, he no longer attempts to drive. While he can generally use the public *436 transportation system to travel from his home to the downtown section of Washington, D. C., he will on occasion find himself on the wrong bus. In traveling to other cities, he has difficulty in understanding timetables and has found himself on the wrong train.
Since graduation from Annapolis, and up to his cerebral accident, plaintiff’s chief abilities were in the fields of mathematics and engineering. His proficiency in these fields has been all but destroyed. Any kind of substantial gainful employment along these lines is impossible. Plaintiff has been able to hold positions only part time or for relatively short periods of time. After attempting some mathematical work, he was ultimately reduced to such office positions as file clerk. In 1957, he had no earnings income in addition to his retired pay. In 1958 he was able to earn $2,002.50. In 1959, he earned only $1,100. He speaks and reads haltingly, and has memory difficulties. He often does not remember or understand what has just been told to him. These are symptoms of his “aphasia”,[8] due to malfunctioning of his brain, which affects speech and thinking ability. For all practical purposes, he is, because of an inability to retain what he hears and a loss of power of concentration, unemployable.
41. (a) As above shown, all of the symptoms plaintiff exhibited between February 3, 1956, and February 8, 1956, the date of his collapse from his cerebral accident, were of a type not uncommonly following a lumbar puncture. It would take a knowledgeable neurologist to be able to distinguish between these relatively common post-lumbar puncture symptoms and the relatively uncommon and almost identical symptoms of a transient hypoxia. Although to a layman it would seem that surgeons especially should be on guard against such an occurrence, the record is bare of any criticism by any knowledgeable expert of Dr. Brown or any other Air Force Hospital doctor or attendant for not having recognized plaintiff’s transient hypoxia symptoms, a matter which lies in the special field of neurology. Dr. Stevens had no such criticism. Dr. Brown was not trained as a neurologist. A neurologist was not a member of the staff of this relatively small hospital. *437 The need for neurologists in small hospitals of this type is so rare that few have them as permanent staff doctors. Only 8 of the 26 naval hospitals throughout the United States have neurologists and only one of all the naval hospitals abroad has such a specialist. As a highly trained specialist, it would be feasible to have one in a hospital only where its size and population density are heavy enough to support one.
For the same reasons, neither Dr. Brown nor any of the other doctors on the hospital staff may fairly be criticized for not calling in any outside neurologist for consultation or to handle plaintiff’s case during said February 3-8, 1956, period. While there were competent neurologists available for consultation in the large closely adjoining London area, calling in such a trained specialist would again depend upon the ability to recognize the symptoms as possibly constituting something other than those commonly associated with a post-lumbar puncture. As stated, since such symptoms are quite identical with those of transient hypoxia, Dr. Brown and the other hospital staff doctors can not fairly be criticized for not having called in a neurologist prior to February 8, 1956. Surgeons and other doctors attending patients after surgery do not routinely call in a neurologist every time a patient exhibits the normal post-lumbar puncture symptoms.
(b) The misdiagnosis by the hospital’s psychiatrist, Dr. Meltzer, and by the other doctors on the hospital staff, of plaintiff’s condition as psychiatric and inorganic, and the treatment plaintiff received thereafter for such a condition rather than for an organic cerebral accident, is not shown to have aggravated plaintiff’s condition in any way or to have resulted in any further damage. Plaintiff’s actions and symptoms at the time of and after the cerebral accident resembled so strongly those of a patient who had suffered a mental breakdown that such a misdiagnosis is understandable. It is often very difficult to tell the difference between organic and functional disease of the brain. This is why some doctors (like Drs. Kruse, Stevens and Nardini) try to combine the fields of neurology and psychiatry. When a patient exhibits symptoms of confusion and disorientation, as did plaintiff, the possibility of psychiatric illness must be considered. In any event, no physical harm to plaintiff resulted from such mis *438 diagnosis. The only treatment for the cerebral accident, whether it was a thrombosis, a hemorrhage, or an embolus, was general rest and absence of excessive exertion. While plaintiff was not kept in bed for a period of time after the accident, as he should have been, and as he was in the London Hospital, there is no showing that any injury or damage resulted from such improper treatment.
(o) It is regrettable that it was plaintiff’s misfortune to have had his surgery performed in a hospital in which a neurologist was not on the staff or was not in some way made available. Had Dr. Brown or one of the other staff doctors who saw or attended plaintiff during the February 3-8,1956, period, in some manner, whether through some special past training or by the unusual gift of extraordinary perspicacity in an essentially different field of medicine, recognized in plaintiff’s symptoms a possible transient hypoxia incident to postural hypotension which could lead up to a cerebral accident, plaintiff’s treatment would have immediately been reversed. Instead of being urged to indulge in early ambulation, plaintiff would have been ordered to remain flat in bed until a neurologist was summoned. As shown, a properly trained and experienced neurologist would in all likelihood have correctly diagnosed plaintiff’s condition and would have ordered treatment which might well have avoided the cerebral thrombosis which plaintiff suffered, a misfortune which has had such a damaging effect upon the lives of plaintiff and his family, consisting of his wife and two daughters. While plaintiff’s cancer and operation therefor (although seemingly successful) would evidently have required his retirement anyway (see finding 29(b) whereby it was assigned a 100 percent disability rating),[9] plaintiff would, in retirement, have undoubtedly been able to earn a substantial amount during his remaining years in some field in which his mathematical and engineering abilities would have been useful.

 The first, higher number is called the "systolic” blood pressure. This is the pressure indicated as the heart beats and pumps out the blood into the arterial system. It is the maximum pressure in the arteries which has to be met by the pumping action of the heart in order to force the blood through. The second, lower figure is called the "diastolic” pressure. This is the pressure within the blood vessels when the heart is relaxed to take in blood which is forced out with the next beat. The systolic reading is the more important.

 A substance containing iodine is injected into the carotid artery (the principal artery of the neck). This substance passes into the entire circulatory system of one side of the-brain, of which an X-ray is then taken. Further X-rays are then taken as the substance moves on in the brain. Large enough defects may show up. Small ones may not-

 “Hypotension” is lowered blood pressure.

 A neurosis marked by stages of fear, anxiety, obsessions, and feelings of inadequacy.

 Dr. Hilton Rose of the Navy, who visited plaintiff at the Air Force Hospital (finding 13) also testified, hut not as an expert.

 In a hernia operation the surgeon does not enter the abdominal cavity and the major vessels are not involved. The operation is on the wall of the abdomen. The operative .site was not a likely site from which an embolus might originate.

 Further indicated by the 145/95 reading on the February 23, 1956, Dr. Brain examination (finding 20).

 A defect in or loss of power of expression by speech or writing, or of comprehending spoken or written language, due to injury of the pertinent brain centers.

 However, the action placing plaintiff on the Permanent Retired List assigned only a 20 percent rating to the cancer condition (finding 34(a)).