**George B. MOUNT and Barbara C. Mount**

v.

**The UNITED STATES.**

No. 709–81L.

United States Claims Court.

June 23, 1983.

George B. Mount and Barbara C. Mount, pro se.

Michael W. Reed, Washington, D.C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D.C., for defendant.

## OPINION

MILLER, Judge:

Plaintiffs seek $100,000 as just compensation under the fifth amendment to the Constitution for the taking of land by the Bureau of Land Management (BLM or the agency) of the United States Department of Interior. The matter is before the court on defendant's motion for summary judgment.

The complaint alleges the following: Plaintiffs, husband and wife, jointly own a tract of land in Kern County, California. In August 1976, the BLM erected a chain link fence surrounding approximately 21,000 acres of land in that county, including plaintiffs' land, for the stated purpose of protecting the desert tortoise from off-road vehicles and to preserve its natural habitat. The fence prevents access by plaintiffs to their property and represents a taking of plaintiffs' land by the government without compensation, because plaintiffs are unable to sell their land and are precluded from enjoying peaceful and quiet possession thereof.

On the basis of plaintiffs' pretrial submission, their answers to interrogatories and an undisputed affidavit, defendant paints a somewhat different picture.

The land in question is 10 wholly undeveloped acres in the Mojave Desert, 80 miles northeast of Los Angeles, which plaintiffs purchased for $2,000 in 1958. Between the time of acquisition and until 1982, a year after they brought this suit, a period of 24 years, they made no improvements to the property, made no effort to sell it, and did not even visit it.

Plaintiffs' property is located in an area surrounded by federal lands in a pattern that has remained essentially unchanged

since prior to 1958. The Mojave Desert in that area contains the highest known density of desert tortoises, as well as other significant wild animal and plant species which have been designated as rare by the California Department of Fish and Game.

Beginning in 1974, these federal lands have been the subject of various measures intended to protect the area's desert tortoise population and natural habitat. At that time BLM restricted the use of off-road vehicles on such public lands. (43 C.F.R. Part 6290 (1975), 39 Fed.Reg. 13612–15 (April 15, 1974).)[1] In the following year, the agency filed an application for the withdrawal of more than 12,250 acres of public lands in Kern County from location and entry under the general mining laws and for the designation of the area as a natural environment area. (40 Fed.Reg. 10491–92 (March 6, 1975).) On January 28, 1980, the lands were withdrawn and the Desert Tortoise Natural Area established. (Public Land Order 5694, 43 C.F.R. Appendix 285 (1981), 45 Fed.Reg. 7815–16 (February 5, 1980).)

During the pendency of the withdrawal application, on May 12, 1976, the district manager of the BLM sent the following letter to affected landowners, including plaintiffs:

Dear Landowner:

The Bureau of Land Management, Bakersfield District Office, is planning on fencing the Tortoise Natural Area, northeast of California City, within the next several months. Adequate entry to all private landholders will be provided by the inclusion of unlocked gates interspersed along the fenceline, with private landholdings in mind.

This arrangement should prove to be beneficial for two reasons: 1) It will protect the habitat of California's State reptile, the desert tortoise, and 2) it will lessen the chance of trespassing by vehicles on

private property inside the area, or at least hold such activity to a minimum.

To eliminate any possible confusion, since BLM rangers and local enforcement agencies will be patrolling the Tortoise Natural Area, we would appreciate all private landowners contacting the Bureau of Land Management prior to entering the fenced area. This is not to restrict the private landholder's movements, but, to allow BLM and the Sheriff's office to detect trespassing by unauthorized people.

Thank you for your cooperation in this important matter.

Sincerely,
[Louis A. Boll]
Louis A. Boll
District Manager

In August 1976, BLM constructed a 31-mile fence enclosing approximately 24,000 acres in the Mojave Desert, except for two gaps of one mile each. Located within that acreage are 16,366 acres of public lands which comprise the Desert Tortoise Natural Area and 7,543 acres of privately owned land, including plaintiffs' 10 acres. In addition to the gaps, to provide access to private landholders, gates were installed at those locations at which the fence crossed roads. No part of the fence enclosing the Natural Area is on plaintiffs' property.

For the reasons discussed hereinafter, it is concluded that plaintiffs are unable to establish that there has been a taking of their property for which any compensation is due from defendant.

II

■ There has been no allegation of any physical invasion of plaintiffs' property. The Desert Tortoise Natural Area is made up exclusively of publicly owned land, and plaintiffs concede that no part of the fence is on their property. Accordingly, a taking

---

1. On May 2, 1975, these regulations were declared invalid in *National Wildlife Federation v. Morton*, 393 F.Supp. 1286 (D.D.C.1975). BLM subsequently proposed new regulations (41 Fed.Reg. 31518 (July 28, 1976)), amended the

proposal (43 Fed.Reg. 29412 (July 7, 1978)), and adopted final rules (44 Fed.Reg. 34834 (June 15, 1979)). These regulations currently are codified at 43 C.F.R. Part 8340 (1982). *See* 43 Fed.Reg. 40734 (September 12, 1978).

by defendant cannot be premised on the theory of a physical taking.

## III

Even without a physical invasion of private property, complete denial or deprivation of access thereto may constitute a taking of such property. *Laney v. United States,* 228 Ct.Cl. 519, 525, 661 F.2d 145, 149 (1981); *Foster v. United States,* 221 Ct.Cl. 412, 423–25, 607 F.2d 943, 949–50 (1979). However, the record in support of defendant's motion for summary judgment indicates without dispute that there has been no denial or deprivation of access to and from plaintiffs' property.

First, BLM's letter to plaintiffs of May 12, 1976, specifically stated that "Adequate entry to all private landholders will be provided by the inclusion of unlocked gates interspersed along the fenceline, with private landholdings in mind." Plaintiffs argue in their response to defendant's motion that the letter itself operated to deny them access to their land. But nothing therein may reasonably be construed to prohibit access to private inholdings. At most, it merely requested that visitors first contact BLM prior to entering the Natural Area. Indeed, the letter expressly provided that there will be entry for private landholders and that the request "is not to restrict the private landholder's movements."

Second, in its pretrial submission defendant asserted that "there exist * * * unlocked gates wherever the fence crosses a road." In their reply, plaintiffs did not take exception to this statement, as required by the standard pretrial order if it were untrue.

Third, an affidavit[2] by Mark E. Lawrence (the Lawrence affidavit), area director for BLM and the person in charge of the Desert Tortoise Natural Area, submitted with defendant's motion, states that

"[u]nlocked gates have been provided along the fence for access to private inholdings."

Plaintiffs have neither submitted any counteraffidavit nor offered any explanation as to their failure to do so. Plaintiffs in their reply to defendant's motion simply assert that their witnesses will testify that the gates are locked. When a motion for summary judgment is made and supported by proper affidavit, the nonmoving party may not rest upon mere allegations or denials or statements of what he believes his witnesses will testify. He must respond with his own affidavits showing that there is a genuine issue of fact for trial, or explain why he cannot do so. Rules of the United States Claims Court 56(e) and (f); *Pacific Far East Line, Inc. v. United States,* 206 Ct.Cl. 378, 384–86, 513 F.2d 1355, 1358–59 (1975); *Royal Indemnity Co. v. United States,* 178 Ct.Cl. 46, 51–52, 371 F.2d 462, 465, *cert. denied,* 389 U.S. 833, 88 S.Ct. 33, 19 L.Ed.2d 93 (1967); *Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 718 (2d Cir.1943). Since plaintiffs have not met this burden, defendant's contention that the gates along the fence are not locked must be accepted as true.

Finally, even accepting plaintiffs' assertion that the gates are now locked, their taking claim on this theory is insufficient. In the same affidavit Lawrence declares, upon penalty of perjury, that "I have personally informed Mr. Mount that if he desires, the Bureau of Land Management will add another unlocked gate to the fence in the area of his property."

## IV

Plaintiffs further contend that as a result of defendant's action their property cannot be sold. In answer to interrogatories submitted to them by defendant, plaintiffs admit that they have made no attempt to sell their property since they first learned of

---

2. Rule 56 of the Rules of the United States Claims Court states that a motion for summary judgment may be supported by "affidavits." Defendant, however, submitted with its motion a "Declaration" subscribed as true under penalty of perjury. Pursuant to 28 U.S.C. § 1746 (1976), such unsworn declarations may be submitted in lieu of affidavits and with like force and effect. In view of the language in Rule 56, the declaration is referred to herein as an affidavit.

the proposal to fence the Desert Tortoise Natural Area; and they offer no affidavit by any witness qualified to testify thereto that because of the fence their property can no longer be sold.

 Plaintiffs state that their property is now "worthless in value." A taking may be found when the diminution in value amounts to the *total* destruction of the value of an identifiable thing which is, or would have been, perceived by a reasonable owner as the subject of a distinct investment. *See Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (government's requirement that defaulting shipbuilder-contractor transfer to it title to uncompleted boats and materials resulted in the destruction of all value in a materialmen's lien and hence was held to be a taking of the lien, requiring just compensation); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (statute prohibiting mining of underground coal when it would cause subsidence of dwellings on surface was held to be a taking of the mineral rights). But plaintiffs offer nothing to support the bald assertion that their land has been deprived of *all* economic value due to the defendant's construction of a fence on its adjoining property. In view of the facts that plaintiffs have access to their land and are permitted to use it as they please, plaintiffs' unsupported assertion that their land has been rendered wholly worthless by the fence does not establish a genuine issue for trial.

██ Plaintiffs' contention that the fence caused the economic value of their property to be reduced, even if it had been properly substantiated by affidavit of a qualified witness, would not provide a basis for compensation, since a mere diminution in value or loss of potential profit is not a taking of property. *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 487–88, 657 F.2d 1184, 1191 (1981), *cert. denied,* 455 U.S.

1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). And *see United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Omnia Commercial Co. v. United States,* 261 U.S. 502, 509, 43 S.Ct. 437, 438, 67 L.Ed. 773 (1923).

Plaintiffs rely on *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency,* 561 F.2d 1327 (9th Cir.1977) and *Archer Gardens, Ltd. v. Brooklyn Center Dev. Corp.,* 468 F.Supp. 609 (S.D.N.Y.1979), to support their argument that government action which substantially interferes with the value of land effects a taking. Neither case aids plaintiffs.

In *Richmond Elks,* the plaintiffs' commercial property was included in a proposed urban renewal project area and specifically designated by the terms of the city's recorded redevelopment plan for acquisition within 4 years. Nearby properties were subsequently acquired and demolished, and property insurance became unavailable (except upon the payment of a high risk premium) and loan money unobtainable. Restrictions were placed on plaintiffs' right to make improvements to their property. Most of plaintiffs' commercial tenants vacated the property, thereby drastically reducing plaintiffs' rental income. Plaintiffs' basement was flooded by construction related to the renewal project and sealed off. Six years later, the plan was dropped. On these facts, the court held that there was a "direct and substantial" interference with plaintiffs' property rights to use, sell, lease and encumber their real property, and that the significant reduction in value caused by this direct and substantial interference constituted a compensable taking. In the instant case, however, the direct and substantial interference with property rights that was crucial to the court's conclusion in *Richmond Elks* simply is not present. There is no physical invasion of plaintiffs' property, no denial of access, no regulation restricting the uses to which the land may be put,[3] and no prohibition against selling, leasing, or otherwise encumbering the land.

---

**3.** Plaintiffs assert in their response to defendant's motion that there are posted signs stating

that the area is prohibited to all motor vehicles. However, the regulations by their terms apply

*Archer Gardens, Ltd.,* the second case cited by plaintiffs, involved an urban renewal project that was delayed for a significant period of time. The plaintiffs alleged that during the delay, throughout which there was a continuing threat of imminent condemnation, they were unable to generate income from their properties by sale, lease or encumberance, and that they were deprived of all reasonable use of their property. The district court denied a motion to dismiss and held that the allegations in the complaint were sufficient to state a claim of taking without just compensation. In reaching this conclusion, the court noted that various tests have been developed to define the line between noncompensable government actions and those which constitutionally require just compensation, including the "less stringent standards" articulated in *Richmond Elks.* The court adopted no particular test and concluded only that the facts as alleged satisfied even the "strictest rule." Contrary to plaintiffs assertion, the case does not stand for the proposition that mere diminution in value, standing alone, can constitute a compensable taking; nor did the court cite *Richmond Elks* for such a contention.

Finally, plaintiffs allege that the erecting of the fence by BLM precludes their enjoying a peaceful and quiet possession of their property. There is no allegation that the land was ever used for any purpose, and plaintiffs concede that from the date of purchase until a 1982 visit to the site with defendant's counsel they did not even visit the property. They have made no effort to improve the land or to sell it. Plaintiffs do not explain how they are prevented from enjoying a peaceful and quiet possession other than by asserting that the presence of the fence is the basis for their complaint. Here, too, summary judgment is an appropriate means to eliminate sham or frivolous complaints and to conserve limited judicial resources.

only to public lands and the Lawrence affidavit establishes that defendant does not prohibit the

## V

### *Conclusion*

In view of the foregoing, defendant's motion for summary judgment must be granted. The clerk will enter judgment for defendant dismissing the plaintiffs' complaint.

use of vehicles on plaintiffs' property.