John L. SHANE and Beatrice
Rosenus Oakland

v.

The UNITED STATES.

Congressional Reference No. 1–79.

United States Claims Court.

Aug. 18, 1983.

Review Panel Report of Nov. 1, 1983.

John L. Shane, Beverly Hills, Cal., for plaintiffs.

John W. Showalter, with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## REPORT [1]

YOCK, Hearing Officer:

On February 1, 1979, by S.Res. 388, 95th Cong.2d Sess., the Senate referred bill numbered S. 2477, 95th Cong., 2d Sess. to the Chief Commissioner of the U.S. Court of Claims.

The bill which is the subject of this referral is entitled "A Bill for the relief of John L. Shane and Beatrice Rosenus Oakland." It proposes that the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated:

> [S]ums owing to John L. Shane and Beatrice Rosenus Oakland, both of Beverly Hills, California, in full satisfaction of all their claims against the United States arising out of the erroneous denial of mortgage insurance by the Federal Housing Authority for the development of certain land located in North Las Vegas, Nevada.

S.Res. 388 directs that the Chief Commissioner shall proceed with the bill in accordance with the Provisions of 28 U.S.C. §§ 1492 and 2509:

> [N]otwithstanding the bar of any statute of limitation, laches, or bar of sovereign immunity, and report thereon to the Senate, at the earliest practicable date, giving such findings of fact and conclusion thereon as shall be sufficient to inform the Congress of the nature and character of the demand of the claim, legal or equitable, against the United States, or a gratuity in the amount, if any, legally or equitably due from the United States to the claimants.

The claimants' petition was filed with the Clerk of the Court of Claims on April 11, 1979, and defendant's answer was filed on July 31, 1979. Thereafter, the parties engaged in extensive discovery and negotia-

1. This report, findings of fact and conclusions are submitted to the Chief Judge of the United States Claims Court pursuant to the Rules of the Court. See RUSSC Appendix D. The case was transferred to the United States Claims Court on October 1, 1982, when the U.S. Court of Claims ceased to exist. *See* Federal Courts Improvement Act of 1982, § 403(d), Pub.L. No. 97–164, 96 Stat. 25 (to be codified in 28 U.S.C. § 171 note).

tions to arrive at a complete stipulation of facts with attached exhibits, which was filed and admitted into the record in lieu of trial. Pursuant to the request of the parties, the stipulation of fact is hereby adopted in pertinent part with attached exhibits, as its Findings of Fact in this case, and made a part of this report.

On the basis of the facts established by the evidence in the record, as summarized in this opinion and set forth more fully in the findings of fact, it is concluded, and the Senate should be so informed, that:

(1) claimants have no legal claim against the United States;

(2) claimants have no equitable claim against the United States; and

(3) any monetary award made by the United States to the claimants would constitute a gratuity.

*Background*

This congressional reference case arises out of the Department of Housing and Urban Development's (HUD) alleged denial of Federal Housing Administration (FHA) mortgage insurance to the claimants because their land was located in an aircraft noise zone too near Nellis Air Force Base, North Las Vegas, Nevada. The claimants contend that the U.S. Air Force improperly classified their property as located in a restrictive noise zone, which, in turn, caused HUD to deny FHA mortgage insurance. This denial of FHA insurance allegedly caused the claimants to suffer financial losses because the land could not be sold or developed. The claimants, therefore, seek damages for the time period during which the land was allegedly erroneously classified in the restrictive noise zone.

As indicated above, the facts have been completely stipulated by the parties and insofar as pertinent are discussed below. Before discussing the specific events of this case, however, it is necessary to explain the Air Force noise testing program and the

role of the Department of Housing and Urban Development in the case.

A. Air Force Noise Measurement

Beginning after World War II, two factors coalesced to make noise from Air Force base installations a major problem: 1) the rapid growth of cities and suburban areas which placed residential and commercial growth in once-rural areas around Air Force bases; 2) the development of jet engines, which are significantly noisier than propeller engines. In the late 1950's, the Air Force contracted with a consultant, specifically the firm of Bolt, Beranek, and Newman, to develop a methodology which would indicate, through noise contours, the effect of aircraft operations in the areas surrounding particular installations. The methodology developed was the Composite Noise Rating or CNR methodology system. The CNR measurement system was first developed in the 1950's, was in general use, and could be considered the state of the art in the 1960's and early 1970's.

A CNR is a measuring system which adjusts the Perceived Noise Level Measurement Scale (PNdB)[2] measurement of a particular aircraft noise event by factoring in the number of such events which occur daily and the time of day at which these events occur. Since the primary concern is residential areas, nighttime noise events are considered more annoying than daytime events and are weighted accordingly. CNR values are computed from the single event noise description expressed in PNdB plus corrections for number of flights and time of day.

In order to visually reflect the impact of aircraft operations on land surrounding an airport installation, experts in the field devised a system of three zones utilizing CNR measurement. Under this system, land surrounding an airport, depending on the CNR measurement at a particular point on the land, would be placed in one of three zones:

2. The Perceived Noise Level Measurement Scale (PNdB) is a scale developed specifically

for the measurement of aircraft noise.

| Composite Noise Rating | | Zone | Description of Expected Response |
|---|---|---|---|
| Takeoffs and Landings | Runups | | |
| Less than 100 | Less than 80 | 1 | Essentially no complaints would be expected. The noise may however, interfere occasionally with certain activities of the residents. |
| 100 to 115 | 80 to 95 | 2 | Individuals may complain, perhaps vigorously. Concerted group action is possible. |
| Greater than 115 | Greater than 95 | 3 | Individual reactions would likely include repeated, vigorous complaints. Concerted group action might be expected. |

On October 1, 1964, the Air Force published AFM 86–5, "Land Use Planning With Respect to Aircraft Noise." This manual gave instructions for the preparation of CNR contour noise maps at Air Force installations. By following the instructions in the manual, the preparer of the map could construct CNR contours utilizing the underlying data concerning type of aircraft flown at the installation, flight tracks, number of missions flown, etc. Following the introduction of AFM 86–5, noise contour maps were prepared locally for many Air Force Bases. Generally, these were prepared manually by the Bioenvironmental or Civil Engineer assigned to the local installation. In the early 1970's, the preparation function of noise contour maps by the Air Force became centralized and computerized at the Headquarters, Tactical Command, Langley Air Force Base, Virginia. Local installations were required on a regular basis to forward the underlying data concerning aircraft operations to Langley Headquarters, which would then prepare a noise contour map based on this data.

### B. Role of the Department of Housing and Urban Development

Pursuant to the provisions of section 203(b) of the National Housing Act, 12 U.S.C. § 1701 *et seq.* (1976), the Department of Housing and Urban Development (HUD), acting through the Federal Housing Administration (FHA), has been authorized to insure mortgages and loans for the purchase of single-family housing, private residences, rental housing, cooperative housing, condominiums, mobile homes, and other types of housing units. The FHA has long been specifically concerned about the impact of airport noise on the development of residential areas around airports. As early as 1961, the FHA directed, by FHA letter No. 1861 dated September 27, 1961, subject: Analysis of Residential Properties Near Airports, that the effect of airports on residential use be considered in determining whether the FHA should guarantee mortgages to houses on subdivisions planned in the vicinity of airports.

On April 16, 1965, the FHA issued underwriting letter number 1989, "Land Use Planning Relating to Aircraft Noise, Technical Report of Bolt, Beranek, and Newman, Inc." This letter, along with the technical report, was furnished to all field offices. The letter set forth the relationship between the FHA and civilian and military agencies concerning airports under their jurisdiction. The letter stated:

The subject report updates the techniques used by the FAA and the military in evaluating certain locations with respect to noise generated by aircraft operations. While the report itself does not make firm recommendations with respect to residential development and places of public assembly * * *, it does describe the expected response of residents when certain composite noise ratings (CNR's) are imposed on the locality in which they live and, basing their conclusions upon its principles, FAA and military personnel will advise and recommend with respect to the appropriateness of residential development at a given location. * * *

When the FAA or the military services analyze proposed residential property locations near airports, the techniques outlined in the subject report will be used. Areas surrounding airports will fall into three noise zones * * *. If proposed housing locations lie in Zone 3, the FAA or the military will describe the expected

response wherein individual reactions to noise would likely include repeated, vigorous complaints and concerted group action might be expected. FAA and the military concur that no new residential development should be concerned [considered] in this zone * * *. Under the conditions applying to Zone 2, it may or may not be possible to develop properties that will be acceptable for mortgage insurance. While the exposure to sound in some instances will be severe, it may be possible that the use of accoustical treatment of a type and character acceptable to the market, such as soundproofing, year-around air conditioning or other treatment, to bring the exposure within the limits of acceptability insofar as sound is concerned. The customary analysis of market will, of course, be made. Where the proposed location lies within Zone 1, the FAA or the military will describe the appropriate expected response. Noise should not be a factor in considering residential development in this zone * * *.

It is emphasized that while technical advice and guidance * * * will be provided by the FAA and the military, the final decision as to the issuance of commitments on properties remains with the FHA field offices * * *.

The procedures to be followed in analyzing whether properties around airports were eligible for FHA insurance were slightly revised and updated in FHA Manual, Vol. VII, Book I, paragraph 71453, dated April 1968. These instructions were continued virtually unchanged in FHA Manual, Vol. VII, Book 1, section 14, paragraph 71453, transmitted May 1970.

On August 4, 1971, HUD transmitted and made effective Departmental Circular 1390.2, "Noise Abatement and Control: Departmental Policy, Implementation Responsibilities, and Standards." The purpose and authority of the Circular was stated as follows:

1. PURPOSE AND AUTHORITY.

It is the finding of the Department of Housing and Urban Development (HUD) that noise is a major source of environmental pollution which represents a threat to the serenity and quality of life in population centers. Noise exposure may be a cause of adverse physiological effects as well as economic losses. Accordingly, it is the purpose of Departmental policy to call attention to this threat, to encourage the control of noise at its source in cooperation with other Federal agencies and departments, to encourage land utilization patterns for housing and other municipal needs that will separate uncontrollable noise sources from residential and other noise-sensitive areas and to prohibit HUD support to new construction on sites having unacceptable noise exposures.

In conjunction with HUD's general policy as expressed in Circular 1390.2, the specific policy regarding HUD assistance for new construction of buildings is stated therein as follows:

(2) *New Construction.* HUD discourages the construction of new dwelling units on sites which have, or are projected to have, unacceptable noise exposures, by withholding all forms of HUD's assistance for such dwelling units. * * *

In regard to CNR and Noise Exposure Forecast (NEF) zones, HUD adopted in Circular 1390.2 the following standards in regard to whether proposed new construction was acceptable or unacceptable for HUD financing:

A. If the proposed construction was to be on land located in CNR Zone 3 or NEF Zone C, then the construction was unacceptable for HUD financing. It was noted that exceptions "are strongly discouraged and require a 102(2)c environmental statement and the Secretary's approval."

B. If the proposed construction was to be located on land located in CNR Zone 2 or NEF Zone B, then the construction was discretionary but normally unacceptable for HUD financing. It was noted that "approvals require noise attenuation measures, the Regional Administrator's concurrence and a 102(2)C environmental statement."

C. If the proposed construction was to be located on land located in CNR Zone 1 or NEF Zone 2, then the construction was acceptable for HUD financing.

HUD policy in regard to noise remained essentially as stated in Circular 1390.2 until July 1979, when the policy was updated and reissued as a regulation, 24 CFR Part 51B (effective August 13, 1979).[3]

As a part of its program of insuring mortgages and loans for housing, the Department of Housing and Urban Development becomes involved in the development of vacant land for the purpose of building housing subdivisions thereon. HUD will agree to insure mortgages for the sale of homes within the subdivision if the subdivision developer complies with HUD standards and procedures in regard to the development and construction of the subdivision. The regulations regarding land planning procedures and data were, as of 1969, contained in the FHA Manual, Volume VII, Part II, Section 5 and 6, "Land Planning Procedures and Data." On April 4, 1973, these regulations were superseded by HUD Circular 4140.2 "Land Planning Procedures and Data For Insurance For Home Mortgage Programs." (This Circular is still in effect.)

In general, a subdivision analysis by HUD consists of an evaluation analysis, an architectural analysis, and a land planning analysis. The evaluation analysis considers market demand having regard for land use, protective covenants, price range, balance between off-site and on-site improvements, dwelling type and rates of absorption of housing in the community, acceptability of a proposed organization for operating and maintaining a community system for domestic water supply and sewage disposal, and the rating of the location. The architectural analysis, part of the subdivision analysis, involves consideration of a suitable variety in housing types, appropriateness of house design and construction, and applica-

tion of site conditions, feasibility, exhibits and engineering features of all water systems and sanitary sewage disposal systems, and construction inspection, both on-site and off-site. The land planning analysis part of the subdivision analysis involves consideration of the physical suitability of the tract, neighbor design, land use and covenants, subdivision-wide or neighbor improvements to land, and provision of new community facilities, and analysis to assure appropriate lot grading and in special instances lot improvements for group applications.

Individual analysis of a parcel of land to determine if the FHA or HUD will insure mortgages on homes built on such land as of 1969 was accomplished in accordance with FHA Manual Volume VII, Book 1, Part IV, Section 16, Paragraph 71611 through 71628 and FHA Handbook 4220.5 dated June 1969, "Accelerated Subdivision Processing." On January 22, 1973, these regulations were superseded by HUD Circular 4135.1 "Subdivision Analysis and Procedures Handbook." (This Handbook has subsequently been revised but is still in effect.)

The manner in which "accelerated subdivision processing" works is as follows (using the Las Vegas Service Office as an example): A developer would submit an Accelerated Subdivision Processing Form 1 (ASP–1) form to the HUD Las Vegas Service Office along with a tentative map of the subdivision. The subdivision appraiser (at that time Mr. Harrison Stephens) would go out and make a physical inspection of the proposed subdivision site. If Mr. Stephens believed that the proposed subdivision was tentatively acceptable for FHA approval, the developer would be sent an ASP–2 form which indicated that processing was on-going (this form could also be used to request additional items from the developer). Mr. Stephens would then fill out an ASP–3

---

**3.** Beginning in the late 1960's and continuing into the 1970's, the Noise Exposure Forecast (NEF) measurement system began to be developed and adopted for use. The NEF measurement system is essentially a refinement of the CNR system. CNR 115 plus and NEF 40 plus correspond to Zone 3; CNR 100–115 and NEF 30–40 correspond to Zone 2; CNR below 100 and NEF below 30 correspond to Zone 1.

form which was used to recommend acceptance of the subdivision by Mr. Stephens to the Chief of the Las Vegas Service Office and the Chief Underwriter (at that time a Mr. Robert Farnsworth). If the decision was made to reject the proposed subdivision, the developer would be sent an ASP–4 form which indicated the reason for the disapproval. This form indicated to the developer that if he disagreed with the reason for the rejection, he could submit additional data to FHA to seek consideration. The developer had the right to appeal rejection of a proposed subdivision from the Las Vegas Service Office to the Nevada State Office, the HUD Regional Office in San Francisco, and, ultimately to the Secretary of HUD. If the Chief Underwriter tentatively approved the proposed subdivision, the developer would be sent an ASP–5 form so indicating and requesting additional information regarding sanitary engineering, site engineering, site planning and other general data. Upon receipt of the requested information and its approval by FHA engineers, an ASP–6 instructed the developer to submit a complete pre-construction exhibit package. If this submission were then approved, HUD would send ASP Form 9 to the developer, which indicated that HUD would insure mortgages for the subdivision.

At least since 1965, as a part of HUD's consideration of a proposed subdivision, the noise impact on land of military and commercial airport operations has been a factor in determining a subdivision's eligibility for HUD mortgage or loan insurance. The regulations, cited earlier, require that whenever some indication of a noise problem caused by airport operations exists, local HUD officials must contact local officials of the Federal Aviation Administration or the appropriate military installation.

It has been a HUD practice at local offices to render informal opinions as to the impact of airport operations on particular land parcels in the vicinity of military and civilian airports. Generally, this means that if a land owner or prospective developer comes into a HUD local office, he may request to see a map of the area which has noise contours drawn on it which contours have been provided to HUD either by the FAA or a military installation. Also, upon request, a HUD official may make a contact, either orally or in writing, with an FAA or military official to receive an opinion as to the impact of airport operations on a particular parcel of land as indicated by the CNR system promulgated by the FAA or the military. However, people who receive these informal opinions from HUD employees are also informed that in order to make a final and official determination as to whether or not HUD would approve mortgage guarantees for a subdivision on a particular piece of land, an application must be made on an ASP–1 form according to the accelerated subdivision processing procedures. During the time frame at issue in this proceeding (1969–1974), no ASP–1 application was ever received by HUD from any of the interested parties.

C. Events of Present Case

The land under dispute in this case is located in North Las Vegas, Clark County, Nevada. Also located in Clark County and near North Las Vegas is Nellis Air Force Base. During the period involved in this case (1969–1974), the primary use of Nellis Air Force Base was by the Air Force Tactical Fighter Weapons Center, which developed fighter aircraft tactics and conducted various tests.

There are five parcels of land involved in this case, and they will be referred to as follows:

1) Parcel One—Approximately 79 acres located in the East Half of the Southwest Quarter of Section 6, Township 20 South, Range 62 East, M.D.M., Clark County, Nevada.

2) Parcel Two—Approximately 68 acres located in the South Half of the Northwest Quarter of Section 5, Township 20 South, Range 62 East, M.D.M., Clark County, Nevada.

3) Parcel Three—Approximately 77.5 acres located in the North Half of the Northwest Quarter of Section 5,

Township 20 South, Range 62 East, M.D.M., Clark County, Nevada.

4) Parcel Four—Approximately 69 acres located in the East Half of the Southwest Quarter of Section 5, Township 20 South, Range 62 East, M.D.M., Clark County, Nevada.

5) Parcel Five—Approximately 3 acres located in the Northeast Quarter of the Northwest Quarter of Section 8, Township 20 South, Range 62 East, M.D.M., Clark County, Nevada.

In 1961, these five parcels of land were purchased by Mr. James Gordon. Subsequently, Mr. Gordon died, and Mrs. Joan Gordon, his widow, sold undivided shares in the five parcels to plaintiffs, Mrs. Beatrice Oakland and Mr. John Shane. In addition, undivided shares were also sold to Mr. Alan Rosenus and Ms. Carol Elman (Elzer). Mrs. Gordon retained an interest in each of the five parcels.

On December 15, 1969, the owners contracted to sell Parcels One and Four to Mr. Clarence Morris. The closing date on the sale was June 15, 1970, but the sale was also contingent upon the property being "approved in all respects by the FHA." The sale, however, did not occur. Mr. Morris could not recall specifically why the sales did not finalize except that he had business difficulties with his partners, and that the parcels were located too far away from town.

Late in 1970, some of the owners met with Mr. Harrison Stephens, who was the Subdivision Appraiser for the HUD Las Vegas Service Office. Mr. Stephens told the owners that it may be difficult to secure FHA mortgages for homes built on one or more of the parcels because some of the parcels fell within the prohibitive noise zones. Mr. Stephens also advised, however, that it was not definite that the FHA would deny mortgages until applications were submitted and reviewed fully.

On January 28, 1971, Mr. Morley Griswold, the Director of the HUD Las Vegas Service Office, wrote a letter to Colonel Leo Drake, who was the Commander of Nellis Air Force Base. Mr. Griswold sought information about the noise rating of the area in which Parcel Four was located. On February 4, 1971, Captain Jerry W. Jackson, Nellis AFB Bioenvironmental Engineer, issued a memorandum concerning Parcel Four. The memorandum stated that Parcel Four was located totally within Zone 2; that residential occupants on Parcel Four would probably complain vigorously about the noise; and that residential construction was therefore not recommended.

On July 23, 1971, Mr. Clay Lynch, the City Manager of the City of North Las Vegas wrote a letter to Mrs. Bernice Oakland (one of the plaintiffs herein) and stressed that the city was interested and was studying the noise problem in regard to the subject properties. On February 22, 1972, Mr. Morley Griswold of HUD sent a letter to Mr. C.D. Brown of the Bank of Nevada stating that Parcel One was located in an area of significant noise and therefore was ineligible for FHA insurance and referred Mr. Brown to Mr. Nicholas G. Burke, HUD Service Office Underwriter, for any questions.

During the last part of March 1972, when Mr. Brown did contact Mr. Burke at HUD, he was advised that Parcel Four was completely within CNR Zone 2 and that HUD therefore had no discretion to grant FHA mortgage commitments for this parcel. Mr. Burke then outlined the appeal procedure to follow if the parties intended to pursue the application on Parcel Four. At this same meeting, Mr. Burke also advised Mr. Brown that Parcel One was mainly within Zone 1 (only partially in Zone 2) and that FHA mortgage commitments could be made as to that parcel upon proper application for same. Mr. Burke further advised that upon application by the parties that he would request the Air Force to conduct additional test runs and ground testings. In a letter to Mrs. Oakland, dated April 7, 1972, Mr. Brown outlined the above information and concluded with a recommendation that the plaintiffs make appropriate application to HUD for Parcel One. On May 12, 1972, Col. Thomas F. Mabrey, Base Commander at Nellis AFB wrote to Mr. Brown and

stated that the Air Force had no objections at all to residential development on the Parcel One property. Subsequently, on June 2, 1972, Mr. Brown wrote to Mr. Griswold at HUD, enclosing a copy of Col. Mabrey's letter and requested reconsideration of his February 22, 1972 letter that indicated Parcel One was ineligible for FHA mortgage insurance.

On July 24, 1973, Mr. John W. Ward, Civil Engineer for Legislation, Directorate of Civil Engineering, Headquarters, USAF, wrote to Mrs. Oakland about her problems developing the land. He stated that, according to HUD publications, the granting of mortgage insurance for housing in Zone 3 was completely out, but that residential development for Zone 2 areas was discretionary. On October 11, 1973, Ms. Irene Porter, Planning Director, City of North Las Vegas, wrote to Mr. A.B. Jacobs, who was representing the owners of the parcels, and indicated that the city was commissioning its own noise impact study of the area since the Air Force noise maps had severely impacted a vast area of land, including the plaintiffs', in North Las Vegas. She further indicated that:

Preliminary findings have been that the decibel levels within CNR Zone 2 are not so high as shown in the Air Force's map. Therefore, we feel our study will show that the boundaries of some of these zones may possibly be changed and also that within a majority of CNR Zone 2 single family residential construction could possibly be permitted with the addition of insulating materials to the homes.

Ms. Porter, at her deposition, stated that in conversations with FHA, the Air Force, and the Environmental Protection Agency, she learned that the Air Force maps were compiled as a result of a model computer program at Langley AFB and that no on-ground monitoring of decibels was actually done. Based on this information and since the maps had such a vast impact on residential development within the North Las Vegas area, the city hired the firm of Las Vegas Testing, Ltd. to do a sound study. In November 1973, Mr. Robert McNutt of Las Vegas Testing published a sound study and a noise-rating map of the North Las Vegas area which was sent to the Air Force, HUD, the VA, and the EPA. This study and map showed that almost all of the plaintiffs' property (four of the five parcels) was outside the noise-impacted zones and therefore might qualify for FHA insured loans. Mr. McNutt stressed that he took into consideration the clear skies (very little cloud cover) and low humidity of the Las Vegas area.

On October 23, 1974, Ms. Irene Porter wrote the following letter in pertinent part to Mrs. Beatrice Oakland:

In accord with our previous correspondence * * * I am pleased to inform you that the Air Force has released a new noise map for the area. A copy is enclosed.

This revised map upholds our contentions and studies which revealed our area did not have the noise impact problem and accomplishes the objective of removing the noise restrictive area from our city and many surrounding areas. As a result of this revision, your property is no longer under noise restrictions or within an area precluded from single family home financing.

We have met with the Air Force and they have transmitted copies of the revised map to HUD, FHA and EPA. It is with a great deal of pleasure that we are able to transmit "good news" to you on this matter of mutual concern.

On December 10, 1974, Colonel George A. Fox, Commander, Nellis AFB, wrote to Mr. Anthon B. Christensen, HUD Las Vegas Service Officer, informing him that, in light of new Air Force Contour Noise Ratings for Nellis AFB, Parcels One, Two, Three, and Four of claimants' property were all located in an area where no restrictions were placed on their use. On December 16, 1974, Mr. Christensen sent a letter to Mrs. Oakland informing her that Parcels One, Two, Three, and Four were in Zone One of the noise map and therefore no restrictions would be applied to development or use of those parcels.

On approximately December 16, 1975, a division of the five parcels was made. Parcel One was given to Mrs. Joan Gordon; Parcels Two and Three went to Mrs. Beatrice Oakland (and her children Alan Rosenus and Carol Elman (Elzer)); and Parcels Four and Five went to Mr. John Shane. On June 1, 1979, Parcel One was sold to Chism Homes for $1,080,000 or $13,000 per acre. No application was or has ever been made for FHA mortgage guarantee insurance for subdivision development on this property. Parcels Two and Three are still owned by Mrs. Oakland, Mr. Rosenus, and Ms. Elman. No applications for FHA insurance on these parcels has been filed.

The following sales of land located in Parcel Four were made by Mr. Shane to Mr. Morris:

| | |
|---|---|
| 1) October 1977 | —5 acres at $5,700 per acre; |
| 2) September 1978 | —10.5 acres at $6,000 per acre; |
| 3) May 1979 | —11.2 acres at $15,000 per acre; |
| 4) December 1979 | —15 acres at $16,000 per acre; |
| 5) April 1980 | —16 acres at $17,000 per acre. |

Mr. Morris submitted an ASP–1 application for FHA mortgage guarantee insurance for a subdivision he built on Parcel Four in October 1977. This application was the first made for Parcel Four, and the FHA approved the application. Finally, Parcel Five is still owned by Mr. Shane, and no application for FHA mortgage insurance has ever been filed.

*Discussion*

The claimants in this reference case contend that the U.S. Air Force improperly classified their real property as located within a restricted noise zone, which, in turn, caused HUD to deny FHA mortgage guarantees to prospective purchasers. This denial of FHA mortgage commitments allegedly caused the claimants to suffer financial losses because the land could not be sold and developed for residential use, during the period of time it was improperly classified. Specifically, the claimants allege that the U.S. Air Force improperly prepared noise rating maps from 1970–1973 which placed the claimants' real property in restrictive noise zones because there was no on-site testing of noise levels at Nellis Air Force Base and that the unique North Las Vegas climatic conditions (such as low humidity and little cloud cover) were not taken into consideration when preparing the maps.

The Government counters the claimants' contention by arguing that the U.S. Air Force used state of the art measurement systems during this time frame; however, since many Government records had been routinely destroyed due to the passage of time, it could not "prove" that the noise maps were prepared accurately and reflected the actual aircraft operations at Nellis. Further, it argues that the claimants should be estopped from now raising the "wrongful" noise maps because they failed to make formal application to HUD to contest the noise map restrictions on their land. Had claimants done so, the Government would have been placed on notice of the contest, made a final determination of the issue, and at least not routinely destroyed the records. Finally, the Government argues that even assuming a Government wrong, there is no indication of damages since the claimants have not proven that the 1970 "sales" fell through because of an inability to get FHA mortgage guarantees.

Claimants in this case have not pressed any legal claims. Had they done so it is clear that *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) and its progeny would have precluded any recovery for damages based on a legal taking claim. It is also very clear that Government regulatory action which merely temporarily reduces property values or results in a loss of potential profits is not a taking of property. *See Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, ——, 657 F.2d 1184, 1191 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982); *Mount v. United States,* 2 Cl.Ct. 717 at 720 (1983) (MILLER, J.); *Mesa Ranch Partnership v. United States,* 2 Cl.Ct. 700 at 707 (1983) (LYDON, J.).

Although it is clear that claimants do not have a valid legal claim, in a congressional reference case, it must be determined if an equitable claim exists. Thus, the primary question in this case is whether the claimants have an equitable claim against the United States for the allegedly erroneous noise maps which led to HUD's denial of the claimants' request for FHA mortgage guarantees.

■ The word "equitable" in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part. *Burkhardt v. United States,* 113 Ct.Cl. 658, 667, 84 F.Supp. 553, 559 (1949). *See generally,* Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical and Current Perspective,* 25 Am.U.L. Rev. 595, 617–25 (1976). This view, however, has eroded over the years and more recent cases have adopted the rule that the United States must commit some "wrong" in order to incur liability under an equitable claim. *The Innocent Victims of the Occupation of Wounded Knee, South Dakota v. United States,* Cong.Ref. No. 4–76, slip op. at 31 (Ct.Cl. June 10, 1981) (LYDON, T.C.); *see also Webb v. United States,* 192 Ct.Cl. 925, 932 (1970); *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 342–43, 180 F.Supp. 386, 390 (1960). "An equitable claim in a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrong doing] on the part of governmental employees, any award herein would be a gratuity." *Wong v. United States,* Cong.Ref. No. 3–74, slip op. at 12–13 (Ct.Cl. November 23, 1977) (LYDON, T.C.); *see also Kochendorfer v. United States,* 193 Ct.Cl. 1045, 1055 (1970). Thus, in order to recover under an equitable claim theory a claimant must show that: 1) the government committed a negligent or wrongful act, and 2) this act caused damage to the claimant.

Based on the evidence presented to this hearing officer, it is concluded that the claimants have failed to show their right to recovery on an equitable claim because they: (1) failed to exhaust their own administrative remedies; (2) failed to prove that the Government committed a negligent or wrongful act; and (3) failed to show they were damaged even if the Government act was wrongful.

■ To begin with, the claimants in this case never did exhaust their administrative remedies. Although they did "informally" request HUD to grant FHA insured mortgages to their proposed subdivision developments on Parcels One and Four, they never did submit the formal application to HUD for approval at any time during the 1970–1974 time frame. Had they done so, several critical events would have taken place. First, the filing of the ASP–1 application

would have forced HUD to make a formal determination of whether the Air Force noise maps precluded residential development on Parcels One and Four. The process of making that administrative determination may well have included a reassessment of the existing Air Force noise maps and further noise testing techniques such as on-site noise testing may have been accomplished. It is certainly clear that Parcels One and Four were located primarily within Zone 2 and to a lesser extent Zone 1. Zone 1 carried no noise restrictions and Zone 2 was a discretionary call for HUD. That call should have been tested, if for no other reason than to allow HUD to possibly rectify an erroneous restrictive noise map.

Second, any adverse determination at the local level in Las Vegas could have been appealed through the chain of command up to Washington, D.C. Again, at any step of the way, the claimants could have been successful, or at the very least, the HUD officials (and Air Force) could have been made aware of the problem and the impact that the noise restriction maps were having on real estate development in the Las Vegas area.

Third, filing the ASP–1 application would have placed HUD (and the Air Force) on notice that the noise maps were being contested and that considerable economic and political heat was being generated. At the very least, it would have placed the two Government agencies on notice that they should not routinely destroy the underlying data that went into the makeup of the noise maps. In order to have equity done, the claimants had to do equity, and in this case, they should have exhausted their administrative remedies. *See generally Mackie v. United States,* 172 Ct.Cl. 393 (1965).

■ Next, the claimants in this case have failed in their burden of proving that the Government committed a negligent or wrongful act. First, the parties agreed that the U.S. Air Force, in preparing their noise zoning maps in the early 1970's using the Contour Noise Rating system of noise measurement, were using the "state of the art" methodology available at that time. The claimants do not contest the methodology the Government used. The Air Force developed and used all kinds of flight data to develop the noise maps such as: 1) the type of aircraft at the air base, 2) the noise characteristics of each plane, 3) the flight

track used by the aircraft, 4) the distribution of each aircraft type on each flight track, 5) the number of "noise events" which occur each day, and 6) the amount of flight traffic during different times of the day. It then developed the maps at the local air base (1970), or later (1972) sent the data into a central location to be analyzed and developed with the aid of computers. Using this information base in 1970–72, the Air Force could well have been correct in its assessment of the noise restrictions as of that time. However, as already alluded to above, the Air Force routinely destroyed the basic data over the years, so that it is simply not possible to reconstruct the accuracy of the data that went into the development of the maps. Thus, it is not possible to prove or disprove that the Air Force maps were prepared wrongfully or negligently. Nevertheless, it is presumed that Government officials act correctly and responsibly until it is proven otherwise. *P. Francini & Co. v. United States,* 2 Cl.Ct. 7, 11 (1983) (WHITE, J.).

Second, the claimants' attempt to counter this lack of proof by pointing to the McNutt sound study which was published in November 1973. The claimants assert that this study showed conclusively that the Air Force had wrongfully or negligently prepared their own prior noise maps. This study, which utilized on-site testing, concluded that the land involved was not subject to the noise restriction zones specified by the Air Force maps because of the uniqueness of the Las Vegas area—primarily due to the low humidity and lack of cloud cover. However, the McNutt study simply does not prove conclusively that the Air Force noise maps were wrongfully prepared. Time marches on, as does technology, and the underlying data may well have changed during these periods of time or the utilization of the air base may have changed. In any event, the Air Force (and HUD) when given the benefit of the McNutt study revised their own studies and methodology and changed their own noise maps, which had the effect of lifting the noise restrictions on the claimants' property as of October 1974. Had the claimants filed an ASP–1 application earlier, perhaps the result would have been the same earlier. The McNutt study by itself simply does not, however, carry claimants' burden of proving that the Government had earlier wrongfully or negligently prepared its own noise maps.

Finally, the claimants have failed to prove that they were damaged by the Air Force noise maps. First, there is no conclusive proof that the two residential development sales that were "lost" in 1970 were lost because of the noise maps, and the resulting failure to gain FHA insured mortgage approval for their properties. Mr. Duke Morris, who was the proposed purchaser (or had an interest in both purchases) in the 1970 transaction could not state at his deposition that the failure of the FHA commitment had anything to do with the sales falling through. Rather, it was his belief and recollection that other factors, such as distance from town and troubles with his partners, caused the transaction to collapse.

Additionally, simply because the claimants could not use the land for residential housing does not mean that other uses, although perhaps less lucrative, were not available. For instance, HUD procedures using the original noise map classification allowed for the construction of industrial structures and other types of buildings on the claimants' land. The fact that a regulation deprives the owner of the most profitable use of land is not sufficient to entitle the owner to compensation. *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *see also Deltona Corp. v. United States, supra,* 657 F.2d at 1193; *Ortega Cabrera v. Municipality of Bayaman,* 562 F.2d 91, 100–01 (1st Cir.1977); *De-Tom Enterprises, Inc. v. United States,* 213 Ct.Cl. 362, 364, 552 F.2d 337, 338 (1977).

Moreover, even assuming the Government forced claimants to retain their land, it is not clear that claimants would have suffered any damages at all thereby. There is no question that plaintiffs' property increased greatly in value from 1970 to 1977, and again from 1977 to 1981. Even assuming the Government forced claimants to retain the land during the 1970–1974 time frame, there is every indication that claimants did as well by keeping the land as they could in any other investment. Claimants have made no showing that their lost opportunity profits would have exceeded the appreciation in the value of their property. To allow claimants both to recover lost opportunity profits and to retain the greatly appreciated value of their land would be to allow them to recover a gratuity. *See Cordeco Development Corp. v. San-*

tiago Vasquez, 539 F.2d 256, 261–62, cert. denied, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976); cf. *United States v. Sponenbarger,* 308 U.S. 256, 266–67, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939); *Hartwig v. United States,* 202 Ct.Cl. 801, 812, 485 F.2d 615, 621–22 (1973).

Based on the above, it is concluded that the claimants have established no legal or equitable claim against the United States, and that any payment to them would be a gratuity.

### REPORT OF THE REVIEW PANEL

Before MILLER, Presiding Judge, and YANNELLO and GIBSON, Judges.

On August 18, 1983, Judge Yock, the hearing officer, filed findings, an opinion and conclusions of law in the above-entitled matter. His ultimate conclusion was that "the claimants have established no legal or equitable claim against the United States, and that any payment to them would be a gratuity."

The applicable rules of this court provide (Appendix D to Rules of the United States Claims Court, Procedure in Congressional Reference Cases):

9. *Acceptance or Exceptions.* Within 30 days after service of the report, each party shall file either, (a) a statement of exceptions to particular findings and conclusions of the hearing officer, or (b) a statement of acceptance of such findings and conclusions.

Claimant failed to file any statement of exceptions to or acceptance of the findings and conclusions of the hearing officer. Defendant accepted such findings and conclusions.

The Review Panel, having considered the report of the hearing officer, adopts the findings, opinion and conclusions in his report with the following minor exceptions:

1. On page 19 of the report (3 Cl.Ct. at 306), the sentence beginning on line 15, together with the authorities cited therefor, is stricken.

2. On page 19, immediately prior to the concluding paragraph (3 Cl.Ct. at 306), the following paragraph is inserted:

The fact that a regulation deprives the owners of the most profitable use of land is not sufficient to entitle the owner to compensation under the fifth amendment to the Constitution. *United States v.*

*Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); see also *Deltona Corp. v. United States, supra,* 657 F.2d at 1193; *Ortega Cabrera v. Municipality of Bayaman,* 562 F.2d 91, 100–01 (1st Cir. 1977); *De-Tom Enterprises, Inc. v. United States,* 213 Ct.Cl. 362, 364, 552 F.2d 337, 338 (1977).